### In re CONSOLIDATED CAPITAL EQUITIES CORPORATION, Debtor.

**Bankruptcy No. 388–37346–SAF–11.**

United States Bankruptcy Court, N.D. Texas, Dallas Division.

June 14, 1993.


John C. Eichman, Jenkens & Gilchrist, Dallas, TX, for CCEC Asset Management Corp.

R. Terry Bell, Caolo, Meier & Jones, Dallas, TX, for Chemical Bank.

### MEMORANDUM OPINION CONTAINING THE COURT'S AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

STEVEN A. FELSENTHAL, Bankruptcy Judge.

The CCEC Asset Management Corporation (CAMC) objects to Chemical Bank's proof of claim as an unsecured creditor of Consolidated Capital Equities Corporation (CCEC), asserting that the guaranty underlying the proof of claim constituted a fraudulent conveyance. The court decided several issues by its memorandum opinion and order on motions for summary judgment, entered April 21, 1992, *In re Consolidated Capital Equities Corp.*, 143 B.R. 80 (Bankr.N.D.Tex.1992), and the corresponding order on motion to exclude evidence, entered February 9, 1993.

Following the court's order on the motions for summary judgment, the court conducted an evidentiary hearing on the remaining issues on October 19–23, 1992, and February 8–10, 1993. On March 5, 1993, the court entered its memorandum opinion containing the court's findings of fact and conclusions of law on the remaining issues.

By order entered June 1, 1993, the court withdrew and vacated the findings of fact and conclusions of law entered March 5, 1993, by granting, in part, CAMC's motion to amend the findings of fact and conclusions of law and provided that the court would enter amended findings of fact and conclusions of law. This memorandum opinion contains the court's amended findings of fact and conclusions of law. The allowance or disallowance of a claim against a bankruptcy estate constitutes a core matter over which this court has jurisdiction to enter a final order. 28 U.S.C. §§ 157(b)(2)(B) and 1334.

CAMC has established that Chemical Bank did not provide CCEC with fair consideration in exchange for the guaranty and that the guaranty liability rendered CCEC insolvent. Accordingly, CAMC has met its burden of proof that the guaranty obligation is "avoidable under section ... 544" of the Bankruptcy Code requiring the disallowance of the claim under 11 U.S.C. § 502(d).

### BURDEN OF PROOF

California law initially imposes the burden of proving insolvency on the party seeking to avoid the obligation. *CCEC*, 143 B.R. at 87; *In re Curry & Sorenson*, 112 B.R. 324, 328 (9th Cir. BAP 1990). However, if CCEC had significant pre-obligation debts, California law shifts the burden of proof to Chemical Bank. *Id.* Courts have analyzed this burden of proof issue either after trial or on appeal, with a full evidentiary record already established. This court addressed the burden of proof prior to the evidentiary hearing. The court entered an order on September 22, 1992, establishing that the court would bifurcate the trial to consider the significant debt issue first. Resolution of that issue would establish which party had the burden of proof.

The cases that explain the shifting of the burden of proof based on significant pre-obligation debts focus on insolvency

considerations. Although discussing significant debt based on insolvency, those courts do not limit insolvency to the statutory test employed in the UFCA. This court therefore analyzed whether CCEC could service its short term and long term liabilities as they became due and whether the fair saleable value of CCEC's assets exceeded CCEC's liabilities prior to incurring the Chemical Bank obligation. Had either CCEC not been able to service its debts or had its liabilities exceeded its assets, CCEC would have had significant debt pre-Chemical Bank obligation and the burden of proof would have shifted to Chemical Bank. *CCEC*, 143 B.R. at 90. The court found by bench rulings that CCEC pre-Chemical Bank obligation could service its short term and long term liabilities as they became due and could have sold its assets to pay its outstanding liabilities. Accordingly, CCEC did not have significant debt pre-Chemical Bank obligation, and therefore CAMC had the burden of proving the fraudulent conveyance elements.

## INSOLVENCY

CAMC must establish that the probable liability on the Chemical Bank guaranty after considering contribution rights rendered CCEC insolvent. Under the applicable California law, the court must assume that on July 15, 1985, the Chemical Bank guaranty was due and owing and not contingent. *CCEC*, 143 B.R. at 91. To have been solvent, CCEC must have been able to sell its assets at arms length in market sales in July 1985 to pay its debts, including the $50,000,000 guaranty. *Id.* On July 15, 1985, CCEC had $10,531,000 cash, $508,000 receivables, $52,000 deposits and other assets, and $393,000 in inventories. CCEC had furniture, fixtures and equipment with a fair saleable value of $7,077,-000 and investments valued at $1,414,000. Don Erickson testified that these assets had about $4,000,000 greater value than attributed by Michael Vick. Mr. Erickson based his value on a trial balance for a July 15, 1985, audit. Chemical Bank did not submit the final audit. Mr. Erickson acknowledged that had CCEC sold its assets on July 15, 1985, his values for plant, prop-

erty and equipment would be closer to Mr. Vick's valuation. The court accords greater weight to Mr. Vick's testimony concerning these assets.

CCEC held a leasehold interest in the Emeryville property. Under California law, that interest carried value not only as an asset but also as a contingent liability. Under the statutory test, the court must assess what CCEC would have had to pay to the landlord to satisfy its probable obligation had it ceased to use the premises following the sale of its other assets.

CAMC argued that the liability on the lease should be set at $36,300,000. Mr. Vick testified that if CCEC invested that amount of money in ten year treasury notes in July 1985, CCEC would have had sufficient sums to satisfy the entire lease obligation. Chemical Bank's witnesses testified to several problems with Mr. Vick's method of determining the value of the leasehold interests and the probable liability on the lease. Mr. Vick's testimony establishes the present value amount needed on July 15, 1985, to satisfy the entire lease obligation. As such, it establishes the guidepost to assess the probable amount of liability on the lease.

CCEC entered the lease in 1983. CCEC could have sublet the premises in 1985. The property manager testified that the property should have relet in four years. However, by 1985, rental rates had decreased making the subrent less than CCEC's obligations under the lease. Using the property manager's absorption rates and time, the present value of the sublease should have been about $12,500,000, with CCEC paying the costs of reletting over time. The court infers that value from Mr. Vick's testimony that value based on 5 years absorption would have been $11,700,-000 and on three years, $14,000,000. The court accords the greatest weight on the absorption time and rental amounts to the testimony of the property manager. The subrent in 1985 for the four years would have been about one dollar a square foot less than the lease rent set in 1983, or $2,100,000 for full occupancy phased in

over four years. Rental concessions for ten years would have totalled $8,400,000. The costs of reletting would have totalled $10,500,000. Mr. Vick's analysis, adjusted by the property manager's testimony, had CCEC pay those costs over time.

The court infers from the testimony that rather than CCEC continuing under the lease, paying the reletting costs, and subleasing and paying the landlord over the remaining term of the lease, CCEC and the landlord would have negotiated a settlement of the leasehold obligations in July 1985 when, under the statutory test, CCEC would have sold its assets and ceased to use the premises. The landlord would have insisted on full possession of the premises with control in his property manager. Consequently, the landlord, not CCEC, would incur the costs of reletting over time. The landlord would expect $10,500,000 in July 1985 from CCEC to cover those costs. Because CCEC would probably pay those costs in July 1985, it would not have paid them over time, and the present value of the sublease in the hands of the landlord would correspondingly increase to the $20,-000,000 range. That still does not provide a total measure of CCEC's probable liability. The landlord would have cash and sublease rights with a present value of $30,-500,000 compared with the $36,300,000 total present value lease obligation. To establish the full probable liability CCEC would have had to pay the difference, about $5,800,000.

The landlord and CCEC would have most probably resolved CCEC's liability by a negotiated arrangement of payment by CCEC of $16,300,000 plus the value of the sublease assigned back to the landlord. Alternatively, the value of the sublease assigned to the landlord results in a corresponding and equal reduction of CCEC's total probable liability on the lease, leaving a net probable liability for the insolvency analysis of $16,300,000. (Total present liability of $36,300,000 less present value of sublease of $20,000,000 assigned to landlord.)

CCEC had contingent liabilities on its books of $9,456,000. CCEC had contingent liabilities for guaranties other than the Chemical Bank guaranty and for other obligations. California law would consider the contingent liabilities debts. The court must assess the probable amount of liability on those debts. Todd Newman testified that CCEC had some exposure on those contingent liabilities. He estimated the probable amount at $7,000,000. John Doyle testified that in 1985 no demands had been made on the guaranties by the real estate limited partnerships (RELPs) and he expected that none would be made. On a letter of credit for which CCEC had contingent liability, less than a $200,000 balance remained in 1985. Mr. Doyle and the Chemical Bank analysis suggest that the assets of the RELPs and REITs exceeded their liabilities so that no demand would be made on CCEC on the contingent liabilities. The witnesses did not testify concerning specific underlying real estate values for each RELP and REIT. The court therefore cannot conclude that CCEC would have no liability on those debts. Mr. Erickson testified that the exposure on the contingent liabilities would be no more than half of the total underlying debt, or $4,000,-000. The court concludes from the evidence that the probable liability would have been closer to the lower end than the higher end. The court estimates CCEC's contingent liability at no more than $2,000,000.

CCEC held certain fee generating general partnership and management interests in the RELPs and advisory contracts with the REITs. CCEC held a broker dealer network with and through its ownership of CCSC. Together these assets constituted CCEC's real estate syndication business. CCEC's general partner interests, partnership management interests, advisory contracts, and relationships with its broker dealer network amount to personal service contracts and relationships. Personal service contracts and relationships constitute difficult assets to market and therefore difficult assets to value for the insolvency test. Each could have been canceled or changed by the REITs or by CCEC's partners in the RELPs. Relationships and programs could have been duplicated or replaced in the market. Nevertheless, these

personal services contracts constituted CCEC assets which could have been sold by CCEC in an actual market in July 1985.

Lee Errickson, Don Erickson and Mr. Doyle testified that CCEC would sell these assets together as a package to maximize their fair saleable value. Mr. Doyle testified that the fair saleable value of the RELP and REIT programs totalled $35,-000,000 and the broker dealer network, $32,000,000.[1] Lee Errickson agreed. Don Erickson testified that the REIT and RELP programs should be valued at $44,000,000 with the broker dealer network valued at $32,000,000.

■ CAMC contends that the court must assume separate sales. Its expert witness, Mr. Vick, testified that the REIT and RELP programs should be assigned a fair saleable value of $19,200,000 and the broker dealer network $130,000 to $260,000. While the California statute directs that the court determine the fair saleable value of CCEC assets if sold in an actual market, it does not preclude the court from considering a packaging of groups of assets if supported by the actual market. While the statute requires the determination of the value of CCEC's assets rather than the value of CCEC, *CCEC,* 143 B.R. at 91, the court has latitude to determine how the assets would be sold in the actual market. Maurice Ash testified that the broker dealer network constituted the life line of the syndication business. Lee Errickson testified that the existing programs would be crucial to maximizing the use of the network. Based on this testimony, the court assumes that one purchaser in an actual market in 1985 would have purchased these assets.

Mr. Doyle, Lee Errickson, Don Erickson and Mr. Vick valued the REIT and RELP programs using a discounted cash flow method, with Mr. Erickson adding anticipated tax yields to his value. Mr. Vick and Mr. Errickson valued the broker dealer network using a replacement cost assessment. Mr. Erickson valued the network in conjunction with the existing programs. He valued the network by deriving the discounted cash flow based on a revenue profile from the capital raised by CCEC's existing programs for the economic lives of the programs. Mr. Erickson had originally valued CCEC as a going concern. However, he revised his analysis to assess the fair saleable value of CCEC's assets. CAMC argued that he did not fully extricate the good will of a going concern from the capitalized, projected earnings an asset could generate.

CAMC contended that the RELP and REIT interests could not be sold because they constituted personal services contracts and because of limitations in the partnership agreements and in the REIT contracts. Those interests could have been sold in an actual market, as indeed they were sold in this bankruptcy case.

The issue is not whether they could be sold but the risks inherent in the market had they been sold. Those risks dictate the discount rate to be used for the cash flow/income valuation. Mr. Doyle and Lee Errickson testified that typical real estate market risk factors result in a rate between 12–18%. Don Erickson testified that a weighted average cost of capital should be used, setting that rate at 14%. Mr. Vick testified that the weighted average cost of capital rate should be used for determining the value of securities of going concerns, not the value of assets. Mr. Vick testified that the weighted average cost of capital rate does not take into account the risks inherent in the sale of the assets. Mr. Vick also testified that Mr. Doyle and Mr. Er-

---

1. Mr. Doyle based his valuation analysis on an A.D. Little valuation prepared for the transaction and found in CCEC's records. An expert employed by A.D. Little who prepared the report did not testify at trial. The report did not possess inherent guarantees of trustworthiness to be admitted under a general exception to the hearsay rule. Fed.R.Evid. 803(24). The report had been prepared as a condition to closing after Chemical Bank approved the loan. The report had thus been prepared to facilitate the closing. Further, as John Lie–Nielson testified, Little prepared the report for tax consideration purposes, not for an evaluation of assets under UFCA. Nevertheless, Mr. Doyle appropriately considered the report found in CCEC's records in making his valuation assessment.

rickson failed to include an assessment of additional risks inherent in these particular assets. Mr. Vick set a 26.8% discount rate. The court accords greater weight to Mr. Vick's discount rate.

Had CCEC transferred its general partnership and management interests in the RELPs, as it ultimately did in this bankruptcy case, the successor's realization of income would have been subject to the consent and approval of the partners in the RELPs. For the publicly traded partnerships, that approval would have been subject to the disclosure, solicitation and proxy requirements of the SEC and of various state securities laws. Had the purchaser successfully navigated the securities disclosure laws and successfully solicited the partners, the purchaser faced the risk of hostile proxy fights to replace it as the general partner. Several players in the existing market in July 1985 effectively controlled access to resources through their ownership of thrifts and insurance companies making them considerable forces in the control of publicly traded partnerships. Mr. Doyle testified that from his experiences beginning in 1988 a successor general partner supported by the selling general partner usually prevailed in proxy fights. However, he presented no basis for not including a risk factor that the purchaser in 1985 might face a proxy fight.

The REIT advisory contracts could have been canceled on 60 days notice. To maintain an advisory contract, access to the board of trustees would be needed. The REIT trustees played considerable roles in the real estate industry. Those trustees would dictate or control which entities obtained or kept advisory contracts. A purchaser who lacked a working relationship with the trustees faced additional risks of realizing the anticipated cash flow. A purchaser with a significant relationship with the trustees would have paid less for the contracts because of the trustees' ability to cancel the contracts with CCEC and proceed to contract directly with the purchaser. In addition, the purchaser would have faced disclosure and other securities issues.

Furthermore, at least two of the existing programs had not been fully funded on July 15, 1985. The purchaser would have faced additional risks that the capital would not be raised and that the projected income stream would thereby not be realized. One RELP had $140–150 million to raise. One REIT had $450 million to raise. By July 1985 the real estate syndication market reacted to or considered Congressional discussions to alter the tax laws. While the real estate industry did not anticipate what Congress would actually do in 1986, the fact of proposed changes already being considered in the market would have added a risk factor to a purchaser's ability to raise the remaining capital. Indeed, in August 1985 CCEC raised no additional capital for its RELP programs, and its monthly average raised for its RELP programs for the last five months of the year averaged one half the amount raised in the first seven months of the year. Mr. Doyle testified that if this capital had not been timely raised, his cash flow value would decrease by approximately $7,000,000. Mr. Erickson would decrease his assessment of value by approximately $10,000,000.

These constitute considerable risk factors not included in the typical 12–18% discount rates used by Chemical Bank's witnesses. Mr. Vick's 26.8% discount rate took them into account.

In projecting a discounted cash flow purchase price of $44,000,000 Mr. Erickson factored $8,000,000 of working capital into the income stream. Mr. Vick testified that Mr. Erickson erred by not including the $8,000,000 in year zero of his projections. A purchaser would not pay CCEC for projected income from working capital he already had or had access to. Mr. Erickson also acknowledged a $500,000 error in his calculations.

Mr. Erickson testified that the purchaser would pay CCEC for the anticipated tax yield from the purchase. Mr. Vick disagreed but testified that, at most, the purchaser would pay pennies on the dollar for any anticipated tax yield. Mr. Erickson testified the purchaser would pay 100 cents on the dollar for the tax yield. The $11,-

000,000 tax yield projected by Mr. Erickson would not be realized because of the greater discount rate a purchaser would use and because of the errors in his cash flow assumptions.[2]

The court therefore accords greater weight to Mr. Vick's testimony and finds that the REIT and RELP programs had a fair saleable value of $19,200,000 in July 1985.

CCEC utilized the broker dealer network of CCSC to solicit real estate investors for its RELPs and REITs. Basically, the broker dealer network provided customers to licensed brokers for real estate investments. Many investors were motivated by income tax considerations. Jorge Russe testified that by July 1985 the real estate market recognized the prospect of tax law changes. Don Erickson testified that although the real estate industry had knowledge of potential changes in the tax laws, the real estate industry's lobbyists in Washington did not anticipate the actual changes made in 1986. Those changes virtually eliminated the syndication business. The point however is not that the market should have anticipated what Congress would do the following year, but that the market actually did consider that changes were being considered. That market knowledge generated a risk factor that cash flow from capital raised by future, not present, real estate programs might not be fully realized. Since by definition the broker dealer network dealt with future programs to be marketed through the network, that constitutes a significant risk factor that the Chemical Bank witnesses did not consider.

Lee Errickson testified that the purchaser of the network would want more than the broker dealer customer list, which he acknowledged could be duplicated for the range of costs assessed by Mr. Vick. The purchaser would consider the costs of developing programs, the securities registration and licensing costs, the publication and publicity costs, the costs of assembling em-ployees and negotiating non-competition agreements. Lee Errickson testified that the costs of performing all those tasks would exceed the costs of replicating the customer list itself. For that reason, he testified that a purchaser in the July 1985 market would have purchased the network with the RELP and REIT programs. Don Erickson agreed. But because a purchaser of the existing programs would have obtained registration, publicity material, staff, etc., to realize the cash flow from the programs, the purchaser needed only the customer list to complete the syndication business. Since the purchaser could duplicate the list for $260,000, Chemical Bank's witnesses failed to explain why the purchaser would pay an additional $32,000,000 to the price paid for the existing programs.

Based on that lack of evidence and the disregard for the significant risk factor that new programs in the future might not raise the projected capital based on market and tax considerations, the court finds that Mr. Vick's testimony should be given the greater weight. Ironically, the sale of all the real estate syndication assets to the same purchaser lends greater weight and credibility to Mr. Vick's ultimate opinion that the purchaser would only pay the additional costs of replicating the customer list. The court finds that the fair saleable value of the broker dealer network was $260,000.

■ The statute requires that the court consider the probable liability for the Chemical Bank guaranty as if no longer contingent. The probable liability would be the face amount of $50,000,000 less the value of the package of contribution rights from JAC and its other subsidiaries or the face amount of $50,000,000 less the amount actually paid by JAC. To make this determination, CAMC asserts that the court should first assume that on July 15, 1985, CCEC paid the $50,000,000 to Chemical Bank and obtained Chemical Bank's collateral from JAC, but further assume that CCEC would be otherwise subordinated to JAC's other creditors. Chemical Bank con-

---

**2.** The court notes the testimony about earned but unpaid commissions. If not already received as cash or included in "inventories," com-missions owed by the REITs or RELPs, if any, would be included in the value of the contracts.

tends that the court should assume that Chemical Bank had first obtained as much as possible from JAC and then turned to CCEC for the balance. Chemical Bank also contends that CCEC would have been subrogated to its position had CCEC paid the guaranty. Chemical Bank contends that the court should value JAC as a going concern. CAMC maintains that JAC should be valued based on the sum of the fair saleable value of its assets in the existing 1985 market.

■ The court must assume that demand had been made on the full guaranty in July 1985. *CCEC*, 143 B.R. at 91. Implicitly, the court must likewise assume that JAC did not pay the note to Chemical Bank. The witnesses agreed that in 1985 JAC's going concern value measured by the value of its equity on a public stock exchange exceeded its liabilities. But the witnesses also agreed that JAC could not pay the Chemical Bank debt in July 1985 from its available liquid assets or from its cash flow. The court cannot assume for purposes of the insolvency analysis that

JAC would incur additional debt. The witnesses speculated but did not establish that JAC could have raised additional capital. Consequently, the court must look to the fair saleable value of JAC's assets to determine the amount it would have paid Chemical Bank or conversely the value of CCEC's package of contribution rights.

Mr. Vick provided the most detailed analysis of JAC's assets and liabilities using the fair saleable value of assets approach. Mr. Erickson's most significant disagreement with Mr. Vick concerned the purchased management contracts. Because Mr. Vick conducted a contract by contract, property by property analysis, the court gives his testimony greater weight. But recognizing Mr. Erickson's testimony, the court finds the values at the higher amount of Mr. Vick's range. CCEC's contribution rights ran to JAC and several of its other subsidiaries. Mr. Vick's testimony combines them into the rights from JAC. The court finds the fair saleable value of JAC's assets as follows:

### Assets

Current:

| | |
|---|---|
| Cash | $ 6,366,000 |
| Marketable Equities Securities | 1,011,000 |
| Notes & Accounts Receivable for Officers, Employees & Affiliates | 14,404,000 |
| Other Accounts Receivable | 11,361,000 |
| Inventories | 1,173,000 |
| Total Current Assets | 34,315,000 |

Non–Current:

| | |
|---|---|
| Notes & Accounts Receivable from Officers, Employees & Affiliates | 1,208,000 |
| Mortgage Notes Receivable | 558,000 |
| Land, Buildings & Equipment | 6,136,000 |
| Johnstown Mortgage Company | 4,750,000 |
| Purchased Management Contracts | 15,700,000 |
| Other Assets | 1,976,000 |
| Premium Value of JAC Subsidiaries | 1,440,000 |
| Total Non–Current Assets | 31,768,000 |

| | |
|---|---|
| Total Assets | $66,083,000 |

---

JAC had current liabilities of: Long term debt $2,981,000; accounts payable to affiliates $71,000; accrued salaries, wages and payroll taxes $5,991,000; accounts payable

and other accrued liabilities $8,623,000; and income taxes payable $548,000. JAC's current liabilities totalled $18,214,000. In addition JAC had the $50,000,000 Chemical Bank obligation and had non-current liabilities of $35,000,000 for convertible subordinated notes. Chemical Bank held security interests in $7,850,000 of JAC's assets.

Under the indenture agreement between JAC and the subordinated noteholders, Chemical Bank and the holders of current debts had priority over the subordinated notes. Under the guaranty CCEC could assert common law, equitable or other subrogation rights to the extent it paid the Chemical Bank obligation. However, under the indenture agreement an obligation to an affiliate does not have a senior or priority right over the noteholders. The indenture agreement defines "Senior Indebtedness" in part as indebtedness "other than ... (b) indebtedness of the Company to any Affiliate ..." The indenture agreement provides that all notes issued thereunder are subordinated to "all Senior Indebtedness." Additionally, the noteholders agreed "[n]o holder of Senior Indebtedness shall be prejudiced in the right to enforce subordination of the Notes by any act or failure to act on the part of the Company." Chemical Bank's right to payment from JAC constituted a senior indebtedness under the indenture agreement. But an affiliate who pays a senior indebtedness due to a failure to act by JAC does not appear to succeed to Chemical Bank's senior position.

Chemical Bank asserts that on July 15, 1985, if it had made demand against both JAC and CCEC, it would have looked first to JAC to service the $50,000,000 obligation. Under that approach, Chemical Bank would have foreclosed on its security interests leaving a debt balance of $42,150,000, and JAC assets of $58,233,000. JAC's current liabilities totalled $18,214,000. The Chemical Bank debt and the current liabilities would have been paid ratably and prior to payment of the subordinated notes. Chemical's share would have been 70% of the $58,233,000 which equals $40,763,000. The net due Chemical Bank would have been $1,386,900, which would have consti-

tuted CCEC's probable liability on the Chemical Bank guarantee.

But the California statute directs the court to assume that demand had been made on CCEC. Implicitly, the court must test the direct effect of the obligation on CCEC. Accordingly, the statute in effect compels the court to determine CCEC's liability had Chemical Bank made the demand on CCEC and CCEC looked to JAC for its contribution rights. Under that approach, CCEC would have paid the Chemical Bank guaranty. Whether or not CCEC could assume senior debt status over the noteholders on a subrogation or other basis under the indenture agreement, Chemical Bank would obtain its collateral or CCEC could obtain the collateral by assignment of Chemical's security interest. Accordingly, one way or the other, the collateral would be credited against the Chemical Bank debt, leaving $42,150,000. JAC's assets after deducting the Chemical Bank collateral totalled $58,233,000. If CCEC was subrogated to Chemical's priority position, its liability would be $1,386,900, the same as if Chemical Bank had been paid directly by JAC. Treating CCEC and the noteholders ratably, after paying current liabilities of $18,214,000, JAC would have $40,019,000 to pay CCEC and the noteholders. CCEC would assert the $42,150,000 of the Chemical Bank debt it had paid. CCEC's share of the $40,019,000 would be 55% which equals $22,010,450. CCEC's probable actual liability to Chemical Bank would then be $20,139,550.

CAMC contends that CCEC should have been subordinated to the noteholders. The indenture agreement does not require subordination. At most, it only requires that CCEC not be subrogated to Chemical Bank's priority position. Thus, although in the abstract a parent corporation should not downstream assets to a subsidiary corporation if that would result in the parent's insolvency, here, where CCEC paid a JAC debt, the indenture agreement implies at least equal and ratable treatment with the noteholders. CAMC has provided no equitable basis for subordinating CCEC to the noteholders. Under the indenture agree-

ment, the noteholders would not be prejudiced in their rights to payment merely because CCEC obtained ratable payment with them after CCEC satisfied the senior indebtedness of an unrelated entity. The court therefore rejects CAMC's approach. Nevertheless, for complete findings, the court finds that if the CCEC contribution rights had been subordinated to the noteholders, the contribution rights would have been worth $5,019,000, and CCEC's liability to Chemical Bank would have been $37,131,000.

Under the court's analysis, treatment of CCEC's contribution rights ratably with the noteholders, after crediting the Chemical Bank obligation with the value of the Chemical security interests, would be the most probable scenario under the California statutory test. Although the indenture agreement could be interpreted differently, such a reading gives effect to all the terms of the agreement. Since the test requires that the court assess the probable liability, the court adopts that approach. CCEC's liability to Chemical Bank would have been $20,177,500, after crediting the collateral value and the contribution rights.

On July 15, 1985, the fair saleable value of CCEC's assets would have been:

Assets
| | |
|---|---:|
| Cash | $10,531,000 |
| Receivables | 508,000 |
| Deposits and other assets | 52,000 |
| Inventories | 393,000 |
| Furniture, fixtures & equipment | 7,077,000 |
| Investments | 1,414,000 |
| REIT and RELP programs | 19,200,000 |
| Broker/dealer network | 260,000 |
| | $39,435,000 |

Its probable liabilities would have been:

Liabilities
| | |
|---|---:|
| Liabilities per books | $ 9,456,000 |
| Lease obligation | 16,300,000 |
| Contingent liabilities | 2,000,000 |
| Chemical Bank guaranty | 20,139,550 |
| | $47,895,550 |

Since CCEC's probable liabilities of $47,895,550 exceeded the $39,435,000 fair saleable value of its assets, CAMC has met its burden of proof that the Chemical Bank obligation rendered CCEC insolvent.

For complete findings, the court further finds that if the Chemical Bank approach to calculating the CCEC contribution rights had been followed, CCEC's liabilities would have been:

Liabilities
| | |
|---|---:|
| Liabilities per books | $ 9,456,000 |
| Lease obligation | 16,300,000 |
| Contingent liabilities | 2,000,000 |
| Chemical Bank guaranty | 1,386,900 |
| | $29,142,900 |

The $39,435,000 fair saleable value of CCEC's assets would have exceeded its liabilities of $29,142,900, so the Chemical Bank obligation would not have rendered CCEC insolvent under this analysis.

Finally if the court had accepted CAMC's subordination approach CAMC would again meet its burden of proof that the Chemical Bank obligation rendered CCEC insolvent. Under that approach, CCEC's liabilities would have been:

| | |
|---|---:|
| Liabilities per books | $ 9,456,000 |
| Lease obligation | 16,300,000 |
| Contingent liabilities | 2,000,000 |
| Chemical Bank guaranty | 37,131,000 |
| | $64,887,000 |

CCEC's liabilities of $64,887,000 would have exceeded the $39,435,000 fair saleable value of its assets.

## FAIR CONSIDERATION

■ In exchange for the guaranty, Chemical Bank did not convey property to CCEC. Chemical Bank did satisfy a CCEC antecedent debt of $5,775,000. Contrary to CAMC's arguments, CCEC had been issued the letter of credit which was satisfied in exchange for the guaranty. Regardless of the actual use of the letter of credit, the pre-guaranty draws constitute a CCEC debt.

CCEC also obtained the stock of CCSC. CCSC owned the broker dealer network. With the reorganization facilitated in contemplation of the JAC purchase, CCEC became CCSC's owner. However, as the witnesses testified, CCEC already controlled CCSC and had complete access to the broker dealer network. CCSC had no employees and amounted to a shell corporation. CCEC's control and use of the broker dealer network remained the same after the reorganization has it had been prior to the reorganization. The parties assessed the value of the CCSC stock for tax purposes in 1985 at $55,000. The court has determined that a purchaser of the network who owned CCEC's existing REIT and RELP programs would have paid $260,000. The court finds that the value of the stock of CCSC to CCEC did not exceed $260,000.[3]

The court has previously determined for the fair consideration analysis that the obligation must be the face amount less the contribution rights. *CCEC*, 143 B.R. at 88. The court has found that to be $20,139,550. Property worth $260,000 and the satisfaction of an antecedent debt of $5,775,000 does not constitute fair consideration for the $20,139,550 obligation. CAMC has met its burden of proof on this element of the test.

## CONCLUSION

CAMC has met its burden of proof on both elements necessary to establish that the Chemical Bank guaranty was "avoidable" under the California statute. Accordingly, CAMC has met its burden of establishing that the Chemical Bank claim based on the guaranty must be disallowed under § 502(d). CAMC's objection to the Chemical Bank claim is **SUSTAINED** and the claim is **DISALLOWED.** Counsel for CAMC shall prepare a separate final order

**3.** Several witnesses testified about the business expectations and the business benefits of JAC's purchase of CCEC that resulted in the guaranty obligation. Unless those expectations and benefits met the statutory definition of the California UFCA they have no bearing on whether the obligation can withstand a UFCA challenge. In the event of a bankruptcy proceeding or a state court challenge upon non-payment of creditors, the obligation must withstand the objective test as defined by the statute. *CCEC*, 143 B.R. at 87–88.

consistent with these amended findings of fact and conclusions of law.