**In re CONSOLIDATED CAPITAL EQUITIES CORPORATION, Debtor.**

**CCEC ASSET MANAGEMENT CORP., Plaintiff,**

v.

**CHEMICAL BANK, Defendant.**

**Bankruptcy No. 388–37346–SAF–11. Adv. No. 390–3881.**

United States Bankruptcy Court, N.D. Texas, Dallas Division.

July 21, 1994.

John C. Eichman, Guy ·I. Wade, III and Thomas A. Anderson, Jr., Jenkens & Gilchrist, P.C., Dallas, TX, for plaintiff.

R. Terry Bell, Joyce–Marie Garay and Craig C. Gant, Caolo & Bell, L.L.P., Dallas, TX, James D. Greenhalgh, Chemical Bank Legal Dept., New York City, for defendant.

### MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

STEVEN A. FELSENTHAL, Bankruptcy Judge.

CCEC Asset Management Corporation (CAMC) seeks a judgment against Chemical Bank under 11 U.S.C. § 550 upon the avoidance of a series of three transfers under 11 U.S.C. § 544. The court issued a partial summary judgment by bench ruling on March 21, 1994, and conducted a trial of the remaining issues on April 18–22, 1994.

This memorandum opinion contains the court's findings of fact and conclusions of law. Bankruptcy Rule 7052. The avoidance of transfers constitutes a core matter over which this court has jurisdiction to enter a final judgment. 28 U.S.C. §§ 157(b)(2)(H) and 1334.

The court adopts the stipulation of facts contained in paragraphs A through SS of the pretrial order.

The court first determines whether the transfers may be avoided under 11 U.S.C. § 544, applying the California Uniform Fraudulent Transfer Act (UFTA). *In re Consolidated Capital Equities Corp.*, 157 B.R. 280 (Bankr.N.D.Tex.1993) [*CCEC*]; *In re Consolidated Capital Equities Corp.*, 143 B.R. 80 (Bankr.N.D.Tex.1992) [*CCEC*]. The court then determines whether Chemical Bank constitutes a transferee or other entity from whom CAMC could recover the trans-

fers under 11 U.S.C. § 550(a). Finally, the court considers whether CAMC is precluded from recovery by the protection afforded transferees in 11 U.S.C. § 550(b).

### 11 U.S.C. § 544(b), Applying California UFTA

■ CAMC seeks to recover the three transfers as fraudulent conveyances pursuant to the California Uniform Fraudulent Transfer Act, Cal.Civ.Code Ann. § 3439 et seq., through 11 U.S.C. § 544(b). To be a fraudulent conveyance, the California UFTA requires that each transfer be made when CCEC was insolvent or that each transfer rendered CCEC insolvent and that CCEC did not receive fair consideration for each transfer.

### Burden of Proof

California law initially imposes the burden of proving insolvency on CAMC as the party seeking to avoid the transfers. *CCEC*, 143 B.R. at 87. If CCEC had significant pre-transfer debts, however, California law shifts the burden of proof to Chemical Bank. *Id.* Based on this court's summary judgment ruling, CCEC had no probable liability on the Chemical Bank guaranty under California law. Without probable liability on the guaranty, CCEC did not have significant debt on July 15, 1985. CCEC's debts did not materially change between July 15, 1985, and October 10, 1985. CAMC therefore bears the burden of proving the fraudulent conveyance elements.

### Insolvency

■ CAMC must establish that CCEC was or became insolvent upon the transfers to JAC on October 10, 1985, January 10, 1986, and April 11, 1986. To have been solvent, CCEC must have been able on the three dates to sell its assets at arms length in market sales and pay its liabilities, including probable liability on contingent debts. The pre-trial order stipulates that at the time of the transfers CCEC's liabilities included, in addition to those on the books, the net Watergate lease obligation and contingent liabilities.

■ CCEC held a leasehold interest in the Emeryville property. Under the Califor-

nia statute, the court must determine the amount of CCEC's probable liability to the landlord had CCEC terminated its lease upon the sale of its other assets. The court has determined that CCEC and the landlord would have negotiated a settlement of the leasehold obligations. The court also found that on July 15, 1985, CCEC and the landlord would have likely resolved the matter by CCEC assigning its sublease rights back to the landlord, terminating the lease and paying the landlord $16,300,000 in cash. Based on the court's summary judgment ruling, the parties are collaterally estopped from relitigating that finding.

Real estate market conditions in Emeryville continued to deteriorate after July 15, 1985, through October 10, 1985, January 10, 1986, and April 11, 1986. Nevertheless, according to the testimony of CCEC's expert witness, Michael Vick, the property manager's expectation of the value of the leased premises did not change. The risk free treasury bill rate did not decrease between July 15, 1985, and October 10, 1985. The court therefore concludes that its finding of the amount of the probable liability would not change between July 15, 1985, and October 10, 1985.

Mr. Vick could not reconcile his analysis of the present value of CCEC's lease obligations with the court's finding of probable liability on July 15, 1985. Mr. Vick read the court's finding to require that the present value of the sublease plus the cash payment to the landlord equal the present value of the entire lease obligation. That formula only served as an analytical framework for the landlord's negotiations with CCEC. Lee Errickson, expert witness for Chemical, also presented at trial an analytical framework for CCEC's negotiations with the landlord. The court assessed the probable outcome of the negotiations. The landlord needed sufficient cash to address the rent reductions, rental concessions, tenant finish-out and other reletting costs. The landlord however would invest his cash in real estate, as Mr. Vick testified, expecting at least a 14.5% annual return for each of the three transfer dates. The landlord's expected yield would have produced a sufficient return to address

the reletting costs during the four year absorption time, while permitting continued investments through the remainder of the original lease term. Compared to the present value of the entire lease obligation on the one extreme and the limitations of 11 U.S.C. § 502(b)(6) at the other extreme, the return of the property plus $16,300,000 constitutes a reasonable measurement of the contingent liability.

Mr. Vick and Mr. Errickson both assessed that the liability would increase about 6% between October 10, 1985, and January 10, 1986, primarily because of the change in the risk free treasury market rates. Because both experts agree on the fluctuation, the court finds the probable liability on the lease on January 10, 1986, to be $17,278,000 with the reassignment to the landlord of the sublease rights and the termination of the lease. Because of a continuing decrease in the risk free treasury rates between January 10, 1986, and April 11, 1986, Mr. Vick assessed a further change of approximately 9% and Mr. Errickson's assessment resulted in a 10% change. The court adjusts by 9.5% to reflect the effect of the interest rate change on the January 10, 1986, calculation. The court finds the probable liability on the lease on April 11, 1986, to be $18,919,000.

The parties also disagree on the probable liability on the other contingent debts, that is, the guarantees and law suits. On July 15, 1985, the contingent liability on the guarantees would have been no more than $2,000,000. No event occurred through the transfer dates that would have triggered actual liability on a guaranty. Accordingly, CCEC's estimated exposure must be reduced. For each transfer date, the contingent liability would therefore have been no more than $1,000,000.

Between July 15, 1985, and October 10, 1985, CCEC had been named as a defendant in two class action securities fraud cases involving the CCIT and CCST REITS. The witnesses agreed that CCEC's probable liability should be based on a presumed settlement. The court finds that CCEC's insurers would bear most but not all of the liability to fund a settlement. The coverage issues triggered in part by the fraud allegations should leave CCEC contributing a portion of the

settlement itself. Because Mr. Vick made this recognition while Mr. Errickson did not, the court accords greater weight to Mr. Vick's assessment of the probable liability for law suit settlements. On the other hand, this exposure did not reach the level of materiality to cause an auditor to qualify an audit. Thus Mr. Vick's assessment must be reduced to reflect that immateriality. The court infers a reasonable assessment of $2,500,000.

### The Assets

On the asset side of the balance sheet, the parties disagree about the value of CCEC's interests in the RELP and REIT programs, the value of the broker dealer network and the value of JAC notes issued to CCEC in exchange for the upstreaming of funds. Mr. Errickson employed the Modigliani and Miller formula to the capital asset pricing model to develop his discount rate for valuing the RELP and REIT programs. Mr. Vick augmented his capital asset pricing model by adding risk factors for the REIT litigation. The court accords greater weight to Mr. Vick's discount rate. A buyer of these types of real estate assets would be concerned about existing litigation involving the REITs, especially those that produce 35% of the cash flow. The litigation risks built into Mr. Errickson's formula contemplate only ordinary course of business litigation, not extraordinary securities fraud litigation. The performance problems within these troubled REITs demonstrate further risks not normally anticipated in the formula. A buyer would discount his purchase price to reflect these risks. A purchaser would not pay CCEC for tax benefits it hopes to derive from income earned from the RELPs and REITs. A purchaser would assume fluctuations in cash flow and not give the benefit of the doubt to CCEC, the seller. Mr. Errickson's model, which he had never before used in representing a buyer of this type of real estate asset, does not reflect the discounts that a purchaser would demand before agreeing on a purchase price for this type of asset. See CCEC, 157 B.R. at 284–85; generally CCEC, 143 B.R. 80. The court, therefore, finds the value of the REIT and RELP programs on October 15, 1985, to be $19,200,-000.

Although Mr. Vick and Mr. Errickson disagreed on the discount rate, they both agreed that the changing market would result in a lower value for the RELPs and REITs on January 10, 1986, and April 11, 1986. Because the court has accorded greater weight to Mr. Vick's discount rate, the court adopts the resulting values for January 10, 1986, $18,700,000, and April 11, 1986, $17,800,000.

For the broker dealer network, Mr. Vick adopts the court's findings for July 15, 1985, for each of the transfer dates. Mr. Errickson disagrees with the court's finding. He testified that a buyer would pay from $11,-970,000 to $12,170,000 for the broker dealer network due to the ability to create programs in the future. The court finds that incredible. The court has previously found that the buyer of the RELP and REIT programs would also purchase the broker dealer network for $260,000, the cost of duplicating the network. CCEC, 157 B.R. at 286. The buyer would be a sophisticated real estate player familiar with this aspect of the real estate business. After duplicating the network, with the existing programs, the buyer could develop and market future or new programs. The buyer would have no need to and would not pay substantial additional amounts for cash flows that might be generated from future programs. The fair saleable value of the broker dealer network for each transfer date was $260,000.

In exchange for each transfer, JAC issued promissory notes to CCEC, for a total of $13,100,000. The notes were subordinated to all other JAC debts. Mr. Vick accorded the notes no value, because the fair saleable value of JAC's assets would be insufficient to pay JAC's other debts. Mr. Errickson accorded the notes value at 50% of face, because JAC's equity traded on the market for value, presuming that if equity was subordinate to both and it had value, the notes should too. As a going concern, JAC had equity value. At liquidation, JAC's equity may be deemed worthless. At the time of the transfers, CCEC could not have made a demand for payment on the notes because of JAC's other debts. Yet CCEC could have found a buyer for the notes among the speculators in the market who would expect some

payment to retire the notes by JAC as an operating entity over time. Mr. Errickson overstates what the speculators would pay, since steep discounts would be expected. By analogy to trading values of subordinated notes in bankruptcy cases, the court accords them value at 5% of face.

Chemical Bank asserts that the CCEC proof of claim filed in the JAC [TCC] bankruptcy case reflects payments on the notes thereby demonstrating value. The court allowed a claim based on the full amount of the notes. That CCEC filed its proof of claim in an amount less than the amount of the promissory notes does not demonstrate that JAC made payments to CCEC in the amount of the difference. Furthermore, the allowance of a claim in full does not establish the dividend or amount to be paid on the claim or its value in the market.

JAC had not executed and delivered a note to CCEC on October 10, 1985. On January 10, 1986, JAC had executed and delivered to CCEC notes in the principal amount of $9,800,000, which had a fair saleable value of $490,000. On April 11, 1986, JAC had executed and delivered to CCEC notes in the principal amount of $13,100,000, which had a fair saleable value of $655,000.

On October 10, 1985, after the CCEC transfer to JAC, the fair saleable value of CCEC's assets would have been:

ASSETS:

| | |
|---|---|
| Stipulated | 18,362,000 |
| REIT & RELP Programs | 19,200,000 |
| Broker Dealer Network | 260,000 |
| JAC Notes | N/A |
| TOTAL ASSETS | $37,822,000 |

Its probable liabilities would have been:

LIABILITIES:

| | |
|---|---|
| Stipulated | 13,029,000 |
| Lease Obligation | 16,300,000 |
| Contingent Liabilities | 3,500,000 |
| TOTAL LIABILITIES | $32,829,000 |

Since the fair saleable value of $37,822,000 of CCEC's assets exceeded CCEC's probable liabilities of $32,829,000, CAMC has not met its burden of proof that the transfer rendered CCEC insolvent.

On January 10, 1986, after the CCEC transfer to JAC, the fair saleable value of CCEC's assets would have been:

ASSETS:

| | |
|---|---|
| Stipulated | 19,271,000 |
| REIT & RELP Programs | 18,700,000 |
| Broker Dealer Network | 260,000 |
| JAC Notes | 490,000 |
| TOTAL ASSETS | $38,721,000 |

Its probable liabilities would have been:

LIABILITIES:

| | |
|---|---|
| Stipulated | 12,954,000 |
| Lease Obligation | 17,278,000 |
| Contingent Liabilities | 3,500,000 |
| TOTAL LIABILITIES | $33,732,000 |

Since the fair saleable value of $38,721,000 of CCEC's assets exceeded CCEC's probable liabilities of $33,732,000, CAMC has not met its burden of proof that the transfer rendered CCEC insolvent.

On April 11, 1986, before the CCEC transfer to JAC, the fair saleable value of CCEC's assets would have been:

ASSETS:

| | |
|---|---|
| Stipulated | 18,153,000 |
| REIT & RELP Programs | 17,800,000 |
| Broker Dealer Network | 260,000 |
| JAC Notes | 655,000 |
| TOTAL ASSETS | $36,868,000 |

Its probable liabilities would have been:

LIABILITIES:

| | |
|---|---|
| Stipulated | 12,155,000 |
| Lease Obligation | 18,919,000 |
| Contingent Liabilities | 3,500,000 |
| TOTAL LIABILITIES | $34,574,000 |

Since the fair saleable value of $36,868,000 of CCEC's assets exceeded CCEC's probable liabilities of $34,574,000, CAMC has not met its burden of proof that CCEC was insolvent just before the April 11, 1986, transfer.

On April 11, 1986, after the CCEC transfer to JAC, the fair saleable value of CCEC's assets would have been:

ASSETS:

| | |
|---|---|
| Stipulated | 14,853,000 |
| REIT & RELP Programs | 17,800,000 |
| Broker Dealer Network | 260,000 |
| JAC Notes | 655,000 |
| TOTAL ASSETS | $33,568,000 |

Its probable liabilities would have been:

LIABILITIES:

| | |
|---|---|
| Stipulated | 12,155,000 |
| Lease Obligation | 18,919,000 |
| Contingent Liabilities | 3,500,000 |
| TOTAL LIABILITIES | $34,574,000 |

CCEC's probable liabilities of $34,574,000 exceeded the $33,568,000 fair saleable value of its assets by $1,006,000. In light of the numerous assumptions and inferences involved in this solvency analysis, that difference is too close to support a conclusion that CAMC has met its burden of proof. The court therefore concludes that CAMC has not met its burden of proof that the transfer rendered CCEC insolvent.

## Fair Consideration

In exchange for each transfer JAC executed a subordinated promissory note in the principal amount of the transfer.[1] The court has determined that each note had a fair saleable value of 5% of the face amount. CCEC did not receive fair consideration for the transfers. When JAC transferred the funds to Chemical Bank, Chemical Bank satisfied JAC's antecedent debt of equal amount. Thus, JAC received fair consideration from Chemical Bank. That consideration cannot however be credited to CCEC because CCEC's guaranty of the Chemical Bank loan to JAC was avoidable.

## 11 U.S.C. § 550(a)

For complete findings, the court addresses whether CAMC could recover, from Chemical Bank under 11 U.S.C. § 550(a), the value of the transfers, if avoidable.

Section 550(a) of Title 11 permits a trustee, here CAMC, to recover property or the value of that property transferred after that transfer has been avoided. Subsections (a)(1) and (2) define specifically the entities from whom the trustee may recover the property: "(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550(a)(1) and (2).

■ The Bankruptcy Code does not define "initial transferee," but the courts have articulated a definition. The Fifth Circuit has adopted the dominion or control test espoused by the Seventh Circuit. *Matter of Coutee,* 984 F.2d 138, 141 (5th Cir.1993).

Under that test, when a debtor transfers funds directly to an entity, that entity is an initial transferee only if it gains actual dominion or control over the funds. *Id.* Dominion over funds means the right to put money to one's own use. *Id.* The Seventh Circuit explained that an entity does not have dominion until it is "free to invest the whole [amount] in lottery tickets or uranium stocks." *Bonded Financial Services, Inc. v. European American Bank,* 838 F.2d 890, 894 (7th Cir.1988).

On October 10, 1985, CCEC wire transferred $3,500,000 to JAC's Trust Company account # 8800249081 in Atlanta. That account had a $140,644.09 balance before the transfer and a $3,699,242.91 balance after the transfer. On October 11, 1985, JAC wire transferred $3,364,464.95 from that account to the JAC account at Chemical Bank in New York, leaving $370,130.84 in the Trust Bank account. The JAC Chemical Bank account had a zero balance before the transfer. JAC did not deposit any other funds in the Chemical Bank account on October 11, 1985. Immediately after the transfer on October 11, 1985, JAC invested in commercial paper all but $464.95 of the proceeds on deposit in the Chemical account. On October 15, 1985, JAC redeposited in the Chemical account $3,366,843.11, the proceeds of the commercial paper maturity plus interest. On the same day, JAC transferred $3,364,464.95 from its Chemical Bank account to Chemical Bank to pay the quarterly instalment on principal and interest and transferred elsewhere the remaining $2,843.10 in interest, leaving only two cents in its Chemical account. The court finds from this evidence that JAC paid Chemical Bank with funds transferred from CCEC.

On January 10, 1986, CCEC wire transferred $3,300,000 to JAC's Trust Company account # 8900249081 in Atlanta. Prior to that transfer, that account had a balance of $186,096.45. Due to timing difficulties with the Friday transfer, the account was debited again on January 10, and recredited on Monday, January 13. On the same day, JAC

---

**1.** One note included another $3,000,000 transfer not at issue in this adversary proceeding. See text accompanying footnote 2.

deposited in the same account a check from CCEC for $3,000,000.[2] On January 13, JAC wire transferred $3,284,843.75 from that account to the JAC account at Chemical Bank in New York. Prior to the transfer, that account contained two cents. On January 17, a JAC check to CCEC for $3,000,000 cleared, leaving a balance of $694,640.65 in the Trust Company account. On January 13, from its Chemical account, JAC made its quarterly principal and interest payment of $3,284,-843.43 on the Chemical loan, leaving 34 cents in the account. The court finds from this evidence that JAC paid Chemical Bank with funds transferred from CCEC.

On April 11, 1986, CCEC wire transferred $3,300,000 to JAC's Trust Company account # 88000993753 in Atlanta. On April 10, prior to the transfer, the account contained $298,-482.99. On April 14, JAC transferred $3,282,394.95 from that account to the JAC Chemical account in New York, leaving $424,352.83 in the Trust Company account. Prior to the Chemical transfer, the Chemical account contained 34 cents. On April 15, from its Chemical account JAC made its quarterly principal and interest payment of $3,282,394.93 on the Chemical loan, leaving 36 cents in its Chemical account. The court finds from this evidence that JAC paid Chemical Bank with funds transferred from CCEC.

■ Utilizing the actual dominion or control test, JAC constitutes the initial transferee for purposes of 11 U.S.C. § 550(a)(1). CCEC made all three transfers directly to JAC, and JAC gained actual dominion or control over the funds. In *Coutee*, the Fifth Circuit held a law firm was not the initial transferee of funds, because the firm deposited the funds into a trust account and was not free at that time to simply keep the money. 984 F.2d at 141. JAC, on the other hand, could have kept the funds transferred by CCEC. JAC was not restricted in its use of the funds. While payment to Chemical may have motivated the transfers to JAC, JAC could have retained the funds and not used them to service the Chemical debt. That it chose to service the debt does not alter JAC's actual dominion over the funds. Be-

fore using them to pay Chemical, JAC invested the October funds in commercial paper and did not transfer the interest earned to Chemical. The court infers that JAC retained at least a portion of each of the other two transfers since the amounts of the January and April Chemical payments were less than the amounts of the corresponding CCEC transfers.

■ CAMC contends that although CCEC transferred the funds to JAC, Chemical was "the entity for whose benefit the transfer was made," for purposes of § 550(a)(1). CCEC transferred the funds to JAC to enable JAC to make its regularly scheduled quarterly interest and principal payments to Chemical Bank. Chemical incidentally benefitted by the transfers. However, a subsequent transferee cannot be the entity for whose benefit the initial transfer was made, even if the subsequent transferee actually receives a benefit from the initial transfer. *Bonded*, 838 F.2d at 895; *See also In re Bullion Reserve of North America*, 922 F.2d 544, 548 (9th Cir.1991); *In re Colombia Data Products, Inc.*, 892 F.2d 26, 29 (4th Cir.1989). "Someone who receives the money later on is not an 'entity for whose benefit such transfer was made'; [sic] only a person who receives a benefit from the initial transfer is within this language." *Bonded*, 838 F.2d at 896. To conclude otherwise would treat immediate or mediate transferees the same as initial transferees or beneficiaries. The court must read the statute to give meaning to each provision; the court cannot read it to render a provision superfluous or insignificant. *See Woodfork v. Marine Cooks & Stewards Union*, 642 F.2d 966, 970–71 (5th Cir.1981). Section 550(a) deliberately separates and treats (a)(1) initial transferees or beneficiaries differently from (a)(2) immediate or mediate transferees. Subsequent transferees are protected by the value and good faith provisions of § 550(b); initial transferees and beneficiaries receive no protection. JAC was the initial transferee of each transfer and the entity for whose benefit each transfer was made by CCEC.

■ At first glance, this conclusion appears to eradicate the distinction between

**2.** This transfer is not at issue in this adversary    proceeding.

"initial transferee" and "entity for whose benefit the transfer was made." However, the classic example of this distinction would exist if CCEC had transferred the funds directly to Chemical to pay JAC's Chemical debt. In that scenario, Chemical would be the "initial transferee" and JAC would be the entity for whose benefit that transfer was made. Furthermore, the paradigm "entity for whose benefit the transfer was made" is the guarantor of debt. When a debtor pays a loan to its lender, the lender is the initial transferee and the guarantor is the entity for whose benefit the transfer was made. *Bonded*, 838 F.2d at 893.

However, because the initial transferee and beneficiary, JAC, used the CCEC funds to make the three payments to Chemical, Chemical constitutes an "immediate or mediate transferee" of the initial transferee. 11 U.S.C. § 550(a)(2).

### 11 U.S.C. § 550(b)

For complete findings, the court now addresses whether Chemical satisfies the requirements to qualify for protection under 11 U.S.C. § 550(b).

■■■■ Section 550(b) excepts from a trustee's power to recover transferred property those § 550(a)(2) immediate or mediate transferees that satisfy certain statutory requirements. A trustee may not recover from a § 550(a)(2) transferee that "takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the avoidability of the transfer avoided." 11 U.S.C. § 550(b)(1).[3] Chemical Bank bears the burden of proving the requirements of § 550(b). *Pension Benefit Guaranty Corp. v. Lundberg Management Group, Inc.*, 6 Tex.Bankr.Ct.Rep. 164, 168–9, 1992 WL 171753 (Bankr.N.D.Tex.1992) (McGuire, C.J.).

### Takes for Value

Subsection (b)(1) requires that the § 550(a)(2) transferee, Chemical, took the transfer for value. JAC transferred funds to Chemical in satisfaction of JAC's previously scheduled quarterly principal and interest payments. Chemical took the transfers in satisfaction of antecedent debt in amounts equal to each of the transfers.

### In Good Faith

The Code does not define "good faith."[4] The absence of a definition in spite of the term's presence in numerous Code provisions,[5] indicates that Congress deferred to the courts to determine good faith on a case-by-case basis.

■■■■ In so doing, the courts have encountered difficulty distinguishing "good faith" from "without knowledge," often applying the two requirements together, as one. *See Bonded*, 838 F.2d at 897–98; *In re Still*, 113 B.R. 311, 314 (Bkrtcy.N.D.Tex.1990); Countryman, "The Trustee's Recovery in Preference Actions," 3 Bankruptcy Developments Journal. 449, 475–480 (1986). One commentator has suggested that the "without knowledge" requirement is merely an illustration of a transferee that could not be in good faith. 4 L.King, Collier on Bankruptcy ¶ 550.03 at 550–17 (15th ed. 1993). That interpretation would render the "without knowledge" language superfluous, which this court may not do. *Woodfork*, 642 F.2d at 970–71. Had Congress intended to merely provide an example, it could have specified accordingly. This court must endeavor to give meaning to each provision of § 550(b) without rendering a provision superfluous or insignificant. Good faith must therefore be considered as a separate concept from "with-

---

**3.** Subsection (2) prohibits recovery from good faith transferees of § 550(b)(1) transferees. Analysis of that subsection is beyond the scope of this case. Therefore, the discussion will be limited to § 550(b)(1).

**4.** Most courts cite legislative history to § 550(b) that the good faith requirement "is intended to prevent a transferee from whom the trustee could recover from transferring the recoverable property to an innocent transferee, and receiving a retransfer from him, that is 'washing' the trans-

fer through an innocent third party." H.R.Rep. No. 595, 95th Cong., 1st Sess. 376, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5963, 6332. This explanation provides little guidance in practical application.

**5.** *E.g.*, 11 U.S.C. §§ 109(c)(5)(B), 363(m), 364(e), 542(c) & (d), 548(c), 549(c), 550(d)(1), 727(a)(9)(B)(ii), 746(a), 1113(b)(2), 1114(f)(2), 1125(e), 1126(e), 1129(a)(3), 1144(1).

638

out knowledge of the avoidability of the transfer." By separating these provisions, Congress directs that the court analyze Chemical's actions in accepting the funds from JAC irrespective of any knowledge of avoidability under a statute. In other words, good faith under § 550(b) is an ordinary business transaction concept. Congress recognized that a creditor can act in good faith even with knowledge that a transfer may be avoidable in the event of an insolvency proceeding.

Generally, Chemical Bank relied on JAC on a consolidated basis, including CCEC, to service the debt. Chemical Bank took the transfers from JAC for value by satisfying a present or antecedent debt. The transfers to Chemical for JAC were executed and received in the normal course of a previously determined payment schedule. They constituted ordinary payments on the due date for quarterly interest and principal on the Chemical Bank loan to JAC for its acquisition of CCEC. Chemical Bank had no reason to look behind the payments to analyze the original source of the funds. Chemical therefore accepted the payments in good faith.

### Without Knowledge of the Voidability

■ The Code requires, however, that even if the immediate or mediate transferee took for value in good faith, the transferee cannot have had knowledge that a statute would make the underlying initial transfer avoidable. Although this court disagrees with Professor King's speculation that the requirement is merely an illustration, the court credits his quote of the notes attached to and interpreting the statute proposed in 1973 by the Commission on the Bankruptcy Laws of the United States. 4 Collier on Bankruptcy ¶ 550.03, at 550–17.[6] The Commission intended knowledge to mean "the transferee knew facts that would lead a reasonable person to believe that the property [transferred] was recoverable." *Id.* (quoting H. Doc. No. 93–137, 93rd Cong., 1st. Sess. pt. II, § 4–609, n. 4 (1973)). Further, the Fourth Circuit clarified that knowledge does

not mean "constructive notice" but may include "actual notice." *Smith v. Mixon*, 788 F.2d 229, 232 (4th Cir.1986) (citations omitted). Congress required "knowledge," and only "actual notice" creates knowledge. This choice over a less stringent requirement like "notice" affords greater protection to subsequent transferees. While knowledge is stronger than notice, knowledge does not, however, require "complete understanding of the facts and receipt of a lawyer's opinion that such a transfer is voidable." *Bonded*, 838 F.2d at 898. When in possession of facts which suggest the existence of others, a transferee may not close its eyes to the remaining facts and deny knowledge. *Id.*

Chemical Bank had expected that JAC would service the CCEC acquisition debt from its consolidated holdings, including CCEC. JAC's consolidated financial statement showed a sufficient net worth to support JAC's payments to Chemical Bank. Chemical Bank had no reason to look behind the transfers to determine the source of the funds. Yet, if it had, Chemical Bank would have found that CCEC was able to upstream funds to JAC to service the first two payments without impairing its solvency.

■ The third payment presents a different situation. By the time of the third payment, a series of events and information would have notified Chemical Bank that JAC was not performing as anticipated and that CCEC's problems were severe enough that payment of the JAC debt could impair its solvency. An investigation would have revealed that CCEC's upstreaming of funds for the third payment placed it on the edge of insolvency.

During or around October 1985, the value of JAC's stock fell 27% in market trading. While JAC's consolidated financial statements demonstrated sufficient liquidity to service the debt, Chemical had also learned that CCEC's performance failed to meet expectations. At the time of the acquisition, the parties anticipated that CCEC's cash flow could service the debt, if necessary.

---

**6.** In 1973 the Commission filed with Congress a draft of the statute with detailed notes interpreting the statute. The proposed statute without the notes was introduced as H.R. 10792 and S. 2565 in the 93rd Congress. *Id.* at 550–17, n. 4.

The performance problems of the troubled REITs demonstrated however that CCEC did not have the value that JAC and Chemical Bank assumed. In light of that problem, JAC renegotiated the purchase price, seeking waivers of financial covenants from Chemical.

In March 1986, between the second and third transfers, Chemical learned through monthly reports that CCEC was not performing according to expectations. CCEC had its own line of credit with Chemical; thus, Chemical was monitoring CCEC. Chemical Bank knew that JAC's projections for CCEC would not be met. CCEC had declining net worth, increased leverage and cash flow problems. Lawsuits and media reports generated negative publicity for CCEC. Chemical Bank knew that CCEC would have further difficulty if forced to service the JAC debt in 1986. While Chemical Bank did not conclude that CCEC's poor performance would lead to a default on JAC's debt to Chemical, Chemical Bank contemplated restructuring the JAC loan to ease cash flow problems.

Although Chemical did not have actual knowledge that CCEC was servicing the debt, it had knowledge of facts that suggested that. Chemical knew facts that would lead a reasonable person to believe that the April transfer was voidable. A sophisticated lending institution, Chemical had access to information sufficient to support an inference of knowledge. Had Chemical made a cursory inquiry before the April 1986 payment, it would have learned that CCEC was servicing the debt and that CCEC's upstreaming of funds to JAC would place CCEC within a zone of insolvency. Had CAMC met its burden of proof on the insolvency issue for the third transfer, the court would hold that Chemical Bank did not accept the transfer without knowledge of the voidability of the avoided transfer. Thus, if CAMC presented sufficient evidence to establish by a preponderance of the evidence that the third transfer made CCEC insolvent, Chemical Bank has not met its burden of establishing that it qualifies for the protection of section 550(b). Under that circumstance, CAMC would have been entitled to a judgment against Chemical Bank to recover the amount of that transfer.

However, because CAMC did not meet its burden of proof of establishing that any of the three transfers rendered CCEC insolvent, the transfers may not be avoided.

**Conclusion**

The three transfers from CCEC to JAC for which Chemical Bank was an immediate or mediate transferee may not be avoided. Chemical Bank is entitled to a judgment dismissing the complaint. Counsel for Chemical Bank shall submit a judgment dismissing the complaint.