In re SPW CORPORATION, Republic Contractors, Inc., Sharpe Mechanical, Inc., Wallace P & I Companies, Inc., Wallace Power & Industrial Co., Inc., Wallace Constructors, Inc., Sam P. Wallace Company, Inc., Brown–Olds Corporation, Sam P. Wallace Company of Louisiana, Inc., Elmwood Sheet Metal, Inc., Wallace International, Ltd., Sam P. Wallace Overseas Corporation, and Sam P. Wallace de Centro America, S.A., Debtors.

ESTATE OF SPW CORPORATION
(formerly Dale L. McCullough,
Trustee, Plaintiff,

v.

A.P.V. EQUIPMENT, INC., et
al., Defendants.

Bankruptcy No. 385–31198 RCM–11.
Adv. No. 387–8000.

United States Bankruptcy Court,
N.D. Texas,
Dallas Division.

Feb. 8, 1989.
Nunc Pro Tunc Nov. 17, 1988.

See also, Bkrtcy., 96 B.R. 676.

E.P. Keiffer, Dallas, Tex., for plaintiff.

Britton B. Banowsky, Dallas, Tex., for defendant.

## REVISED MEMORANDUM OPINION

ROBERT McGUIRE, Chief Judge.

This matter comes before the Court following the trial on an adversary action filed by the debtor in possession, SPW Corporation ("SPW") to recover a payment made to defendant, Carrier Corporation as preferential pursuant to 11 U.S.C. § 547. The following constitute the Court's findings of fact and conclusions of law as required by Bankruptcy Rule 7052. This Court has jurisdiction over the matter pursuant to 28 U.S.C. § 157(b)(2)(F) as a core matter.

The parties stipulated that the Court could pass on the credibility of the affidavits submitted into evidence. The parties made the following six stipulations regarding background facts.

1. National Mechanical ("NM") sold job # 6007, better known as Turtle Creek Center, to Republic Contractors, Inc. ("RCI"), on April 16, 1984. RCI assigned this project to Wallace Mechanical Corp. ("WMC") contemporaneously on the same day.

2. WMC, a subsidiary of SPW Corporation ("SPW"), is a subcontractor which performed the mechanical requirements on major commercial property developments. Such requirements generally include the plumbing, heating ventilation and air conditioning.

3. Carrier Corporation is a supplier of heating, ventilation and air conditioning equipment and has supplied such equipment to NM and WMC from 1982 through 1984. Attached as Exhibit A is a history of the transactions between Carrier and WMC from 1982 through 1984.

4. Invoice # 9002663 from Carrier Corporation to NM/WMC reflects the following information:

   a. November 12, 1984 is the invoice date for one 190 K machine to be delivered to the job site at 3 Turtle Creek Center, Dallas, Texas. The invoice date is the date the obligation to pay is incurred.

   b. The invoice seeks payment of $48,470 for the item referenced.

   c. The term for payment contained on the invoice is net thirty days.

   d. The thirtieth day following the invoice date was December 11, 1984.

   e. The 190 K machine was delivered and accepted.

5. Carrier Corporation sent its notice of intent to lien, as a materialman under Texas law on January 22, 1988 and again on February 19, 1988.

6. SPW, by check #008632, paid Carrier Corporation the sum of $48,470. The check was dated February 27, 1985. It was deposited by Carrier Corporation on February 28, 1985 and was paid by WMC's bank on March 5, 1985. The total number of days from ship date to delivery of the check is 108 days, to payment 113 days. Debtor's bankruptcy petition was filed May 6, 1985.

SPW sought to recover $48,470 as a preferential transfer pursuant to 11 U.S.C. § 547. Since the parties stipulated that the elements of § 547(b) have been satisfied, the only remaining issue for the court to decide involves whether the transfer by SPW to Carrier falls within the "ordinary course of business" exception, contained in 11 U.S.C. § 547(c)(2)(A–C).

In order to satisfy this exception to recovery of a preferential transfer, a defendant bears the burden of proof to meet the three part test. See 11 U.S.C. § 547(g). First, a defendant must show the debt was incurred in the ordinary course of business. See 11 U.S.C. § 547(c)(2)(A). In this case the parties have stipulated that this condition has been met. Second, a defendant must prove the transfer was "made in the ordinary course of business or financial affairs of the debtor." See 11 U.S.C. § 547(c)(2)(B). Finally, the creditor must show that the payment was made "according to ordinary business terms". See 11 U.S.C. § 547(c)(2)(C).

In determining whether a transaction is made in the ordinary course of business and according to ordinary business terms, courts have generally taken two approaches. The court, in *In Re Steel Improvement Co.*, 79 B.R. 681 (Bankr.E.D. Mich.1987), offers a good comparison of the two views.

> A majority of the decisions have confined their inquiry to whether the manner and timing of the late payments at issue were consistent with the manner and timing of previous payments made by the debtor in its course of dealings with the creditor.
>
> \*       \*       \*       \*       \*       \*
>
> A minority of decisions recognize a significant distinction between the requirements of subparagraphs (B) and (C) of Section 547(c)(2) and hold that the late payments at issue must meet *both* requirements in order for the "ordinary course of business" exception to apply.

*Id.* at 683–684. (Emphasis added). In other words, under the first approach, courts only look at the parties' prior dealings. In contrast, the second view requires that a court examine the industry standards in addition to the parties' prior dealings.

In determining which approach to apply, the Court notes that several Circuit courts have considered issues involving the ordinary course of business exception. See *In re Continental Commodities*, 841 F.2d 527 (4th Cir.1988); *WJM, Inc. v. Massachusetts Dept. of Welfare*, 840 F.2d 996 (1st Cir. 1988); *Matter of Xonics Imaging, Inc.*, 837

F.2d 763 (7th Cir.1988); *In re White River Corp.*, 799 F.2d 631 (10th Cir.1986); *In re Craig Oil*, 785 F.2d 1563 (11th Cir.1986). Although SPW argues that four Circuits have adopted the minority view, an examination of the cases reveals that the issue is not as clear cut as SPW contends. Only one of the decisions discusses and applies as a separate test "ordinary business terms" by finding that late payments are outside the meaning of this phrase. See *Craig Oil*, 785 F.2d at 1563. Only one of the decisions discuss the split of authority in the area. See *Xonics*, 837 F.2d at 766. However, even the *Xonics* court does not choose which path to follow because the parties stipulated that the transfer was according to ordinary business terms. In another case, the Tenth Circuit holds that subpart (C) is satisfied without discussing the conflicting interpretations of the phrase. *In re White River*, 799 F.2d at 631. In *Continental Commodities*, the Bankruptcy Court finds the "ordinary business term" condition is satisfied but the Seventh Circuit never discusses the issue. 841 F.2d at 527. Finally, the First Circuit holds that the ordinary course of business exception consists of "three *distinct* elements", however they find that the transfer in question is not "ordinary" under 547(c)(2)(B) thus never reaching the issue of ordinary business terms. *WJM*, 840 F.2d at 1010.

Turning to the language of the statute, the court finds the inclusion of subpart (C) into the Code significant. The legislative history provides little guidance. The purpose of the ordinary course of business exception is to "leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." H.R. Rep. No. 95–595, 95th Cong., 1st Sess. 373 (1977), *reprinted in* 5 U.S. Cong.Code & Admin. News 5787, 6329 (1978) (the "House Report"). The Eleventh Circuit has also delved into the purpose of the ordinary course of business exception.

... this exception is directed primarily to ordinary trade credit transactions. These typically involve some extension of credit but are meant to be paid in full within a single billing cycle. [citations omitted]. Because the credit extended is meant to be extremely short-term, Congress likened payment of trade credit to payment of current expenses.... Since the foundation of this provision is the similarity of trade credit and current expenses, the scope of its protection is necessarily limited to trade credit which is 'kept current' or other transactions which are paid in full within the initial billing cycle.

*In re Craig Oil Co.*, 785 F.2d at 1567, citing among others, *Barash v. Public Finance Corp.*, 658 F.2d 504, 511 (7th Cir. 1981), *cf., In re Air One, Inc.*, 80 B.R. 145, 147–48 (Bankr.E.D.Mo.1987), *In re Southern Commodity Corp.*, 78 B.R. 626, 628 (Bankr.S.D.Fla.1987). Also see, 2 *Norton Bankruptcy Law & Practice*, § 32.19 (1988) and *In re Bourgeois*, 58 B.R. 657 (Bankr.W.D.La.1986). In DeSimone, *Section 547(c)(2) of the Bankruptcy Code: The Ordinary Course of Business Exception Without the 45 Day Rule*, 20 Akron Law Review 95 (1986) ("DeSimone Article"), it is stated:

The main policy behind the ordinary course exception is to prevent preference laws from disturbing normal financial relations. This makes sense when one considers that the purpose of preference law is to discourage unusual action on the eve of bankruptcy that interferes with the bankruptcy distribution. Ordinary course transactions do not do this and, in fact, uphold the preference/bankruptcy policy of avoiding bankruptcy in the first place. If preference law applied to pre-bankruptcy ordinary course of business transactions, few creditors would extend credit to troubled debtors; and without credit, few troubled debtors could continue in business. Section 547(c)(2) encourages creditors to extend credit to financially troubled debtors. It strikes a balance between the need to discourage unusual action and the troubled debtor's need to receive credit in order to continue

in business and, hopefully, turn his troubles around.

*Id.* at 100.

Other courts have found the inclusion of subpart (C) into the Code a significant consideration in their adoption of the minority approach. As the *Steel Improvement* court notes "[t]he difficulty with the majority approach is that either it ignores subparagraph (C) of Section 547(c)(2) and thereby makes it a nullity, or it interprets subparagraph (C) to require the same showing as subparagraph (B) and thereby makes it superfluous." *Steel Improvement*, 79 B.R. at 684. In the absence of legislative intent to the contrary, the Court gives the language in subpart (C) effect and considers the industry standards as a part of the inquiry of whether a transaction was in the ordinary course of business. Accordingly, the Court will consider the standard in the industry as well as the parties' course of dealing to determine whether the transfer comes within the ordinary course of business exception under section 547(c)(2). "The fact that a long overdue payment is ordinary between the parties does not mean it is in the ordinary course of business within the meaning of the exception." *In re White*, 64 B.R. 843, 850 (Bankr.E.D.Tenn.1986).

In the DeSimone Article, it is stated:

It seems clear that late payments should not be considered 'ordinary course' when the debtor normally pays on time. But what if the debtor has established a practice of paying several days (or weeks) after the due date? The court in *Ewald* hinted, in dicta, that it might be possible to prove that the debtor had established a practice of making late payments. But it is hard to argue that such a practice is according to ordinary business terms. The 547(c)(2)(C) requirement was, no doubt, put in to prevent protection when the terms of payment, though normal for the parties are not accepted practices for most businesses. Regularly accepting late payments is not normal for most businesses and not the kind of conduct Congress intended 547(c)(2) to protect. However, requiring

payment exactly on the due date is too much; payments that are made within one or two days of the due date should be protected whether or not the debtor had an established practice of making payment one or two days late. This is not the kind of 'unusual conduct' that Congress intended to be excluded from 547(c)(2) protection.

20 Akron Law Review at 117. DeSimone continues the analysis by stating:

The first step is to decide whether each ordinary course requirement provides a subjective standard, an objective standard, or both an objective and a subjective standard, against which to measure the transaction in question. There is little double that Congress intended for potential 547(c)(2) transfers to be judged both objectively and subjectively. It would be difficult to 'preserve normal financial relations' without relying primarily on the parties' past conduct. Of course, some transactions clearly were not intended to receive 547(c)(2) protection, no matter how ordinary they are to the parties. Thus, an objective standard is also needed. The question is: What standard does each element require?

The court in *In re Production Steel* felt that 547(c)(2)(B) provides a subjective standard, while 547(c)(2)(C) provides an objective standard. Section 547(c)(2)(B) states that the payment must be made in the 'ordinary course of business' *of the debtor and the transferee [i.e., creditor].* Given its focus on the *parties'* course of business, it is proper to consider it as setting out a subjective test. In contrast, the failure of section 547(c)(2)(C) to mention the parties when it speaks of ordinary business terms indicates that it is an objective standard. It could be argued that section 547(c)(2)(C) contains both an objective and a subjective element. However, the parties' 'ordinary business terms' are easily included within their 'ordinary course of business or financial affairs.' Any further distinction is unnecessary; having one element focus subjectively on the transfer, while the other looks at it objectively

is less confusing and leads to a clearer analysis.

*Id.* at 123–24.

In considering which transactions are "ordinary", courts generally look at several factors including the timing, the amount and manner a transaction was paid and the circumstances under which the transfer was made. *In re First Software Corp.,* 81 B.R. 211 (Bankr.D.Mass.1988); *In re White,* 58 B.R. 266 (Bankr.E.D.Tenn. 1986); *Matter of Ullman,* 80 B.R. 101 (Bankr.S.D.Ohio 1987). If all the parties' transactions are considered, *i.e.,* pre and post preference period, then an examination of the timing of this transaction as compared with others that the parties' have engaged in the past reveals that the average amount of time between the invoice date and the date that Carrier received the payment was approximately 109 days. The transaction at issue was paid 113 days after invoice.

One court has held that, in considering the prior relationship of the parties, the court should only consider those payments made outside the preference period because they were more indicative of the true "course of business" between the parties. *In re First Software,* 81 B.R. at 213. During the preference period, it is understandable that a debtor's payments would become more extended. The *Xonics* court stated:

Sunnyvale's counsel suggested at argument that late payments made within the preference period could establish the ordinary course of business between the parties if as in this case insolvency occurred early in the parties' relationship. We hesitate to agree, especially when the only evidence that late payments were within the ordinary course of business is that the debtor made such payments after he became insolvent. But see *In re Mindy's, Inc.,* 17 B.R. 177 (Bankr.S.D. Ohio 1982).

*Matter of Xonics Imaging, Inc.,* 837 F.2d at 767. If the first payment, which was 210 days to payment after delivery, is discarded as an aberration, as it appears it should be, then, excluding payments during

the preference period, the average date from shipment to payment is eighty-five days. If the 210–day payment is included, but the preference period payment is still excluded, then the average days from shipment to payment is 93. Including the 210–day payment, in the prepreference period, then four of sixteen payments were paid in excess of one hundred days after shipment. During the preference period all ten of the payments were paid in a triple digit number. See Exhibit A attached. Where the parties have had a lengthy business history, as here, it appears that payments made during the preference period should be accorded little weight in the § 547(c)(2)(B) analysis. Except for the unusual collection activity discussion hereinafter, the Court finds that otherwise the creditor would have satisfied its burden under § 547(c)(2)(B). Excluding the 210–day aberration and the preference period payments, four of the remaining sixteen prepreference period payments were made in periods of 100 to 135 days.

It should be noted that there are limits in this area:

> The real problem is to determine if the parties' past practice had reasonable and ascertainable boundaries. If so, and the transfers in question fell within them, then it should be protected. However, if past conduct was so random and haphazard that it yields no reasonable, ascertainable boundaries, then the transfers should not be considered ordinary.

The DeSimone Article, *supra* at 126.[1]

The amount and the manner by which the transfer was made was consistent with prior transactions between SPW and Carrier. Over the two year period, the average transfer between SPW and Carrier totaled approximately $49,000. Since the amount of the transfer in question is $48,470, this amount is consistent with prior transfers by SPW to Carrier. Also, the manner of the transfer, by corporate check, is consistent with SPW's prior payments to Carrier. Subjectively, the transaction was ordinary between the parties with regard to the

timing, amount and manner the amount was transferred.

There is a question concerning whether the transaction was paid under ordinary circumstances. The legislative history indicates the purpose of the ordinary course of business exception is to "leave undisturbed *normal* financial relations ... and to discourage *unusual* action by either the debtor or his creditors...." See House Report, *supra*, at 6329. (Emphasis added). The Court next considers whether SPW's payment to Carrier was as a result of any type of unusual collection activity on behalf of Carrier. See also *Craig Oil*, 785 F.2d at 1566, *In re Production Steel*, 54 B.R. 417 (Bankr.M.D.Tenn.1985) (requiring letter of credit, substantial down payment, payment before it was due held to be unusual action on the part of the creditor); *In re Day Telecommunications*, 70 B.R. 904 (Bankr. E.D.N.C.1987) (insisting on payment before performing future legal services held to be unusual collection activity on the part of the creditor); See also *In re Bob Grisset Golf Shoppes, Inc.*, 78 B.R. 787 (Bankr.E. D.Va.1987); *In re Circleville Distributing Co.*, 84 B.R. 502 (Bankr.S.D.Ohio 1988). In this situation, when SPW's debt to Carrier remained unpaid, Carrier sent a lien notice. However, the lien notice was sent one week late and was ineffective to perfect lien rights under the Texas Property Code. Later Carrier mailed a second lien notice, which was also too late to be effective. According to the affidavit by Carrier's Credit Manager of Equipment Sales, Antonio Mignano, he is familiar with Texas lien laws and the statutory notice requirements. Also, Mignano's affidavit provides no evidence of any unusual problem or particular circumstances that delayed the sending of the lien notice in this case. Further, there was no evidence presented that late lien notices are the ordinary practice between the parties. Donny Daniel's affidavit stated, and the Court finds, that sending late lien notices is not common in the industry. The Court finds that the notices were sent to put additional pressure on SPW to satisfy its unpaid obligation to Carrier. SPW

---

**1.** Also, for other exceptions, see the DeSimone Article, *supra* at 126, n. 254.

paid Carrier within eight days of receiving the second lien notice.

A review of the preference period activity indicates that, except for this check and two checks totalling less than $2,500, all other checks received by Carrier were joint checks. Per Carrier's affidavit, such joint check arrangement was only used on the Intercontinental Hotel project in South Carolina. Such arrangement had been set up at the direction of the general contractor. Debtor contends that a reasonable inference may be made that this payment was sent by the Debtor as a result of the unusual collection activity on the part of Carrier.

Even if the late lien notices were not viewed as evidence of unusual collection practices asserted by Carrier and the payments regarded as resulting from such unusual activity, the questioned transfer does not meet the "ordinary business terms" requirement of 11 U.S.C. § 547(c)(2)(C). As SPW's witness, Donny Daniel, a person with 16 years experience in the construction industry, states in his affidavit, depending on when an item is delivered, a supplier can expect to be paid any time from 35 to 75 days after delivery. Daniel noted that payment in some circumstances may be made as late as 90 days after invoice, however, this is not the norm, but is known to occur with some degree of frequency. Since the payment in this case was made 113 days after the Carrier invoice date, the Court finds that the credible evidence is that this transaction was completed outside the payment range that is standard in the industry, or general business practice. See the DeSimone Article, *supra* at 127. Accordingly, the transfer does not satisfy the "ordinary business terms" requirement of 11 U.S.C. § 547(c)(2)(C).

In summary, the transfer from SPW to Carrier does not meet the ordinary course of business exception contained in 11 U.S.C. § 547(c)(2). Therefore, Carrier will be held liable for the amount of $48,470.