**In re SOUTHMARK CORPORATION, Debtor.**

**SOUTHMARK CORPORATION, Plaintiff,**

**v.**

**SCHULTE, ROTH & ZABEL, Defendant.**

Bankruptcy No. 389–36324–SAF–11.
Adversary No. 391–3364.

United States Bankruptcy Court,
N.D. Texas,
Dallas Division.

Aug. 13, 1997.

---

**27.** *See Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662 (1974).

Larry Chek, Jenkens & Gilchrist, Dallas, TX, for Plaintiff.

Robin Phelan, Haynes and Boone, L.L.P., Dallas, TX, for Defendant.

## MEMORANDUM OPINION AND ORDER

STEVEN A. FELSENTHAL, Bankruptcy Judge.

Southmark Corporation has brought this action under 11 U.S.C. §§ 547 and 550 to recover $1,000,000 plus interest from Schulte, Roth & Zabel. Southmark reimbursed Schulte, Roth's clients, generally referred to as the Parks Group in this litigation, $3,300,000 for their costs and expenses, including legal fees, incurred in conducting a proxy contest and related litigation. Southmark contends that the Parks Group transferred $1,000,000 of the $3,300,000 to Schulte, Roth.

Based on the law of this case, *Southmark Corp. v. Schulte, Roth & Zabel (In re Southmark Corp.)*, 88 F.3d 311 (5th Cir.1996), *cert. denied*, — U.S. ——, 117 S.Ct. 686, 136 L.Ed.2d 611 (1997), and the memorandum opinion and order entered by this court on March 24, 1997, Southmark has established the elements of § 547(b). Schulte, Roth countered that the transfer had been made in the ordinary course of business, 11 U.S.C. § 547(c)(2), or had been contemporaneously made in exchange for new value, 11 U.S.C. § 547(c)(1). By the order entered March 24, 1997, this court granted Southmark's summary judgment motion dismissing the Schulte, Roth defense under § 547(c)(1) and set the defense under § 547(c)(2) for trial.

Southmark requests a money judgment under 11 U.S.C. § 550. Schulte, Roth contends that it was not a subsequent transferee of $1,000,000 of the $3,300,000 transferred to the Parks Group, 11 U.S.C. § 550(a)(2), but, if it was, it took it in good faith, for value and without knowledge of the voidability of the transfer. 11 U.S.C. § 550(b). By the order entered March 24, 1997, the court denied the motions to resolve those issues on summary judgment, setting them for trial.

The court conducted the trial on June 24, 1997. This memorandum opinion contains the court's findings of fact and conclusions of law as required by Bankruptcy Rule 7052. This litigation involves a core matter over which this court has jurisdiction to enter a final judgment. 28 U.S.C. §§ 157(b)(2)(F) and 1334. On June 24, 1997, the court signed a joint pretrial order, containing stipulated facts. The court adopts those stipulations as its findings.

Under § 547(c)(2), a trustee may not avoid a preferential transfer "(2) to the extent that such transfer was (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and (C) made according to ordinary business terms." 11 U.S.C. § 547(c)(2). The purpose of the ordinary business course defense is to "leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 373 (1977), *cited in In re SPW*, 96 B.R. 683, 685 (Bankr. N.D.Tex.1989). The court must determine, using an objective and a subjective standard, whether the transfer was made in the ordinary course. 96 B.R. at 687. This court must look to the parties' course of dealing and the industry's course of dealing.

Southmark asserts that it does not ordinarily incur obligations to compensate shareholders for their expenses in connection with a proxy context. Schulte, Roth contends, on the other hand, that complex publicly traded companies often encounter proxy contests for corporate control, and, when they do, the contest is ordinarily resolved in a manner similar to the manner in which the Parks Group contest was resolved.

In the spring of 1989, Southmark was a vast and complex publicly traded holding company, characterized as a diversified real estate-based financial services company. While its subsidiaries principally engaged in the purchase, management, development and sale of real estate and the creation and sales of real estate related investment products, Southmark also owned all the common stock of San Jacinto Savings Association, a federally insured Texas-chartered savings and loan association, and two insurance companies. Southmark had over 800 affiliates and subsidiaries and connections with numerous public and private partnerships. *In re Southmark*, 113 B.R. 280, 283 (Bankr.N.D.Tex. 1990).

On March 1, 1989, the Parks Group disclosed to the Securities and Exchange Commission its intention to propose nominees for election to the Southmark board of directors. On April 20, 1989, the Parks Group publicly announced its intention to wage a proxy contest for control of Southmark. Two weeks later, the Parks Group disseminated to Southmark's shareholders statements opposing the Southmark board. In connection with the proxy contest, the Parks Group and Southmark commenced litigation against each other. Schulte, Roth represented the Parks Group in connection with the proxy contest and the related litigation.

On May 24, 1989, the parties executed a settlement agreement. In addition to ending the proxy contest and the litigation, the Parks Group obtained a minority position on the Southmark board of directors. Southmark agreed to the appointment of three Parks Group nominees to the Southmark board. Southmark would include the nominees in its slate of nominees recommended for election for two years. The Parks Group agreed not to engage in a proxy solicitation in opposition to Southmark. Southmark agreed to reimburse the Parks Group for all expenses, including attorneys fees, incurred in connection with the proxy contest and the litigation. Southmark transferred $3,300,000 to the Parks Group pursuant to the settlement agreement.

Southmark had been engaged in other shareholder litigation in 1989. In addition to the Parks Group proxy contest, Southmark was the target of a proxy contest by the Elliott Group and was the insurgent in a proxy contest waged against National Heritage. Southmark was a defendant in class action or shareholder derivative litigation in *Wells v. Southmark, Aronwald v. Southmark, Steiner v. Southmark, Abrams v. Southmark* and *Salsitz v. Southmark*. This litigation involved claims for fraud, misrepresentation of financial information, insider dealing and breach of fiduciary duty. But litigation of this nature generally falls outside the ordinary course of business. *In re Florence Tanners, Inc.*, 184 B.R. 520, 521–22 (Bkrtcy.E.D.Mich.1995); *Hickey v. Nightingale Roofing, Inc.*, 83 B.R. 180, 184–185 (D.Mass.1988). This type of litigation, by its very nature, raises claims outside the corporation's normal business and financial relations.

To prevail under § 547(b), Schulte, Roth must establish that the transfer was for a debt incurred in the ordinary course of Southmark's business and made in the ordinary course of Southmark's business or financial affairs, and in the ordinary course of publicly held corporations similar to Southmark. Professor Alan Miller, Ph.D., a professor of management and business at the University of Nevada at Las Vegas, testified that a proxy contest for corporate control constitutes an exception, rather than the norm, for corporate business affairs. Although the Securities and Exchange Commission has not gathered proxy data since 1977 or catalogued the number of corporations subject to its regulations, Miller's studies identified over 6900 SEC-regulated corporations from 1956 to 1977 and over 18,000 from an SEC report. His studies of those corporations revealed an average of 18 proxy contests for corporate control per year over 30 years. In 1989, the year of the Parks Group proxy contest for corporate control of Southmark, Miller testified that 40 corporations faced proxy contests, of which 18 were control contests.

Miller further testified that even for financially troubled corporations, a proxy contest for corporate control remained out of the ordinary. A proxy contest for corporate con-

trol has a disruptive effect on corporate business. A study of the effectiveness of proxy contests in the *Journal of Financial Economics* identified 70 proxy contests for companies listed on the New York Stock Exchange and the American Stock Exchange from 1978 to 1985. Of those, 48 were waged for corporate control. When companies listed on other exchanges were considered, the study totaled 141 proxy contests for corporate control from 1962 to 1983. H. DeAngelo and L. DeAngelo, "Proxy Contests and the Governance of Publicly Held Corporations," 23 *Journal of Financial Economics* 29, 31 (1989). At the outset of their analysis, the DeAngelos recognized that the proxy contest for corporate control was "widely viewed as the ultimate vehicle enabling stockholders of publicly held corporations to discipline incumbent managers who fail to maximize firm value." *Id.* at 29. Resort to an "ultimate vehicle" is outside or beyond ordinary business affairs.

This evidence establishes that proxy contests for corporate control do not occur in the ordinary course of business of a publicly held corporation. Schulte, Roth has consequently failed to establish a dispositive element for the application of § 547(c)(2).

Schulte, Roth argues, however, that when a proxy contest for control does occur, it is customarily resolved as the Parks Group contest had been resolved. Burton Lehman, Schulte, Roth's lead attorney on the Parks Group engagement, specialized in hostile takeovers of publicly held companies and other types of corporate transactions in the 1980s. He represented insurgents in several proxy contests for control of corporations. He testified that typically a proxy contest for corporate control with related litigation was resolved by settlement with the insurgents obtaining a minority position on the board of directors and a reimbursement of their expenses and other forms of considerations. Lehman testified that Schulte, Roth's fees incurred by the Parks Group in connection with the proxy contest were paid in a manner consistent with payment of legal fees in corporate takeover transactions.

The DeAngelos study observes that even when insurgent stockholders fail to obtain a board majority through a proxy contest, their efforts frequently play a significant role in effecting a change in corporate top management. 23 *Journal of Financial Economics* at 50, 52. Miller recognizes that a proxy contest typically results in some representation on the corporation's board of directors. Miller, "Corporate Transformations: The New Role of Proxy Contests," *Review of Business St. John's University* (March 22, 1994), 1994 WL 13559727.

Based on this evidence, Schulte, Roth has established that the Parks Group proxy contest and related litigation had been resolved according to ordinary business terms. 11 U.S.C. § 547(c)(2)(C). The proxy contest, however, remains an extraordinary event in the business affairs of a publicly held corporation. 11 U.S.C. § 547(c)(2)(A) and (B). Thus, even though Southmark faced two proxy contests in 1989, the proxy contest was an extraordinary event, not a normal business affair, for Southmark and for publicly held corporations.

Based on these findings of fact and conclusions of law, Schulte, Roth's defense under § 547(c)(2) must be dismissed.

### 11 U.S.C. § 550(a)

Southmark requests a money judgment from Schulte, Roth under 11 U.S.C. § 550. Subsections (a)(1) and (2) define specifically the entities from which Southmark may recover: "(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550(a)(1) and (2).

On May 24, 1989, at 1:26 p.m. E.S.T., Southmark transferred $3,300,000 by wire transfer to Schulte, Roth's general operating bank account at Citibank, N.A., in New York. Schulte, Roth held the funds as an escrow agent. If Southmark and the Parks Group executed their settlement agreement, Schulte, Roth would forward the funds to the Parks Group. If Southmark and the Parks Group did not fully execute their settlement agreement, Schulte, Roth would return the funds to Southmark.

On May 24, 1989, Southmark and the Parks Group executed the agreement. On

Schulte, Roth's instructions, on May 25, 1989, Citibank wire transferred $3,300,000 from Schulte, Roth's account to the account of R & P Ventures at First Union National Bank in North Carolina. As an escrow agent, Schulte, Roth was not the initial transferee of the $3,300,000. *See CCEC Asset Management Corp. v. Chemical Bank (In re Consolidated Capital Equities Corp.)*, 175 B.R. 629, 635–637 (Bankr.N.D.Tex.1994).

■ Consequently, to obtain a money judgment against Schulte, Roth, Southmark must establish that Schulte, Roth was a subsequent transferee of $1,000,000 of the $3,300,000 transferred to R & P. 11 U.S.C. § 550(a)(2).

At the time of the $3,300,000 transfer to the R & P account, that account had a balance of $10,675.44. On May 25, 1989, R & P drew a $1,000,000 check on its First Union account made payable to Byron Investments/Branch Banking and Trust Account. That check was deposited into the Byron account on May 26, 1989. The check cleared the R & P account on May 30, 1989.

On May 25, 1989, Byron drew a $1,000,000 check on its account payable to Schulte, Roth for its legal fees for services to the Parks Group. This check was sent by overnight delivery to Schulte, Roth in New York, and deposited in Schulte, Roth's general operating account at Citibank on May 26, 1989. By agreement with Citibank, Schulte, Roth had the use of the funds on May 26, 1989. The check actually cleared the Byron bank account in North Carolina on May 30, 1989.

■ Schulte, Roth contends that on May 26, 1989, the date of delivery of the Byron check, it did not receive any of the $3,300,000 Southmark transferred to R & P. The court must determine the legal significance of the date of delivery to Schulte, Roth of the Byron check. To determine when a transfer occurred for purposes of 11 U.S.C. § 547(b), the court applies the date the drawee bank honors the check. *Barnhill v. Johnson*, 503 U.S. 393, 394–95, 112 S.Ct. 1386, 1387–88, 118 L.Ed.2d 39 (1992). However, to determine whether the transfer may be excepted from being avoided under § 547(c)(2), the court applies the date of delivery of the check.

*Braniff Airways, Inc. v. Midwest Corp.*, 873 F.2d 805 (5th Cir.1989)(case decided under prior statute, issue of date of delivery of check for ordinary course defense unaffected by statutory amendment and rule of law remains binding precedent in this circuit). Although the Supreme Court has not decided the date of delivery issue under § 547(c)(2), the Supreme Court recognizes that § 547(c)(2) is designed to encourage creditors to deal with troubled debtors on normal business terms by obviating any worry that a subsequent bankruptcy filing might require the creditor to disgorge as a preference an earlier received payment. *Barnhill*, 503 U.S. at 402, 112 S.Ct. at 1391 (but the Court questioned the need under the amended statute for a date of delivery rule of law for an ordinary course analysis). Thus, to assure that protection, an analysis of a payment made in the ordinary course by check would include a date of delivery of the check consideration.

■ This court can discern no persuasive reason given Fifth Circuit precedent not to apply that rule of law to a defense tendered under § 550(a) as well as under § 547(c). Indeed, public policy may dictate even stronger reasons to apply that rule of law to a defense under § 550(a). By statutory definition, the targeted defendant under § 550(a)(2) did not receive the initial transfer of the debtor's interest in property. Rather, the bankruptcy trustee contends that the initial transferee transferred the debtor's interest in property to the defendant. But, the defendant received a transfer from an entity other than the debtor. The bankruptcy trustee must establish that the defendant was a subsequent transferee. If a creditor is encouraged under § 547(c)(2) to continue to deal with troubled debtors on normal business terms, a third party to the debtor-creditor relationship should be encouraged to deal with the debtor's creditor on normal business terms. Indeed, under § 550(b)(1), the Bankruptcy Code deliberately separates and treats (a)(1) initial transferees differently from (a)(2) immediate or mediate transferees. The Code provides a subsequent transferee with a group of protections not available to initial transferees. *See CCEC*, 175

B.R. at 636. Thus, to accomplish the protections of the Code, to determine whether an initial transfer of a debtor's interest in property has been transferred to a subsequent transferee, the date of delivery of a check should be used in the evidentiary analysis.

Southmark argues, however, that in *CCEC* this court actually traced funds through various bank accounts. 175 B.R. at 635–636. The court agrees that the evidentiary analysis requires the court to consider the tracing of funds through bank accounts.

On May 26, 1989, Schulte, Roth received a check for $1,000,000 from Byron. Citibank made $1,000,000 immediately available, albeit provisionally, U.C.C. § 4–201(1), to Schulte, Roth. Using the date of delivery of the check for a subsequent transferee test, Byron's $1,000,000 transfer to Schulte, Roth was completed on May 26, 1989. On that date, Byron did not have the $1,000,000 transferred by R & P in its account. Although the court may use the date of delivery for defensive purposes, *Barnhill* still instructs that the R & P transfer to Byron did not occur until the R & P bank honored the check by paying it. 503 U.S. at 399–400, 112 S.Ct. at 1390–91. That check did not clear until May 30, 1989. Southmark has not met its burden of proof that Schulte, Roth was a subsequent transferee of Southmark's interest in the $3,300,000.

Based on these findings of fact and conclusions of law, Southmark may not obtain a judgment against Schulte, Roth under 11 U.S.C. § 550(a).

Southmark contends that a reasonable person must conclude that Schulte, Roth received $1,000,000 of Southmark's $3,300,000. Section 550 is a technical statute. Cash is fungible. Schulte, Roth received a check from Byron on May 26, 1989, for $1,000,000. On that day, upon presenting the Byron check to Citibank, Schulte, Roth actually received $1,000,000 in cash from Citibank. Citibank did not advance Byron's money. Regarding Byron's property, under the teaching of *Barnhill*, Schulte, Roth did not receive any interest in Byron's property on May 26, 1989. But, upon delivery of the Byron check, Schulte, Roth received $1,000,000 in cash from Citibank. Southmark argues that if the Byron check did not later clear, Citibank would have recourse against Schulte, Roth. If Citibank did not actually receive Byron's cash, Schulte, Roth would have to make Citibank whole. U.C.C. § 4–214(1).

A bankruptcy trustee faces a difficult evidentiary burden under these circumstances. But it is no more or less difficult than applying the rule of law that the date of delivery of a check for purposes of § 547(c)(2) may be used to defend against a transfer that would otherwise constitute a preference. Financial institutions intervened in the flow of transactions following Southmark's transfer to R & P. Even if Byron ultimately needed a portion of Southmark's money to make good on its check issued on May 25, 1989, when Schulte, Roth received the check on May 26, 1989, and presented it to Citibank, and Citibank deposited $1,000,000 in Schulte, Roth's account, R & P still held Southmark's money.

Southmark argues that under the Uniform Commercial Code, Citibank acted as an agent for Schulte, Roth to collect the Byron check. U.C.C. § 4.201(1). It collected cash for the check on May 30, 1989. Byron used some of Southmark's money to honor the check. Although Byron did use some of Southmark's money to ultimately honor the check on May 30, 1989, upon date of delivery of the check on May 26, 1989, Citibank deposited $1,000,000 in cash in the Schulte, Roth account. Citibank did not advance Southmark's money or Byron's money. Recognizing, however, that an appellate court may conclude that, as a matter of law, the court should analyze the evidence with a broader perspective, less protective of a subsequent transferee defendant, intending thereby to expand the recoveries of otherwise appropriate transfers, the court would find that Byron's Branch Banking & Trust Account contained $843,936.69 on May 26, 1989. On May 29, 1989, R & P drew a $975,000 check on its First Union account which was deposited into Byron's account on May 30, 1989. On May 30, 1989, the Byron $1,000,000 check to Schulte, Roth cleared the Byron account. After the payment, the Byron account was left with a balance of $805,676.71. With these findings, an appellate court can render a decision on this point without the need for a remand.

### 11 U.S.C. § 550(b)(1)

Assuming Schulte, Roth was a § 550(a)(2) transferee of $1,000,000 of the $3,300,000 transferred to the Parks Group, Schulte, Roth contends that it took for value, in good faith and without knowledge of the voidability of the transfer. 11 U.S.C. § 550(b)(1). Schulte, Roth bears the burden of proving the requirements of § 550(b). *CCEC*, 175 B.R. at 637.

Subsection (b)(1) requires that the § 550(a)(2) transferee, Schulte, Roth, took the transfer for value. Lehman described in his testimony the legal services Schulte, Roth provided to the Parks Group. The $1,000,000 payment compensated Schulte, Roth for those services. A transfer in satisfaction of an antecedent debt is a transfer for value. 11 U.S.C. § 550(b)(1).

Good faith under § 550(b)(1) constitutes a separate concept from knowledge of the voidability of the transfer. *CCEC*, 175 B.R. at 637–638. Good faith under § 550(b) is an ordinary business transaction concept. A creditor can act in good faith even with knowledge that a transfer may be avoidable in the event of an insolvency proceeding. *CCEC*, 175 B.R. at 638. The court must determine whether the Parks Group transferred $1,000,000 of Southmark's $3,300,000 to Schulte, Roth in the normal course of their relationship.

On six occasions between January 16, 1989, and July 7, 1989, Schulte, Roth invoiced the Parks Group; five of those in writing, four to Byron and one to R & P. Schulte, Roth invoiced only the May 24, 1989, $1,000,000 fee orally. When Herbert Parks was in New York on May 24, 1989, Lehman requested that he pay the $1,000,000 for legal services rendered. Lehman knew that if Southmark and the Parks Group successfully completed settlement negotiations, Southmark would fund the settlement on May 24, 1989. As part of the settlement, Southmark would reimburse the Parks Group for its legal fees. Lehman orally communicated an estimate of those fees on May 24, 1989. Lehman testified that this practice was consistent with the manner in which Lehman obtained payment of fees in settlement of other proxy contests.

Lehman asked Parks for a prompt payment of fees upon settlement with Southmark. Parks agreed to pay immediately without the need for an invoice. Lehman knew his clients to be wealthy men, capable of prompt payment. After Schulte, Roth transferred the $3,300,000 to the Parks Group, Lehman testified he had nothing to do with the funds and had no idea what the Parks Group did with them. He testified that he did not provide the Parks Group with legal advice on what to do with the $3,300,000.

Byron paid Schulte, Roth two days later. Although this payment was made sooner than payments following written invoices, the Parks Group paid Schulte, Roth in an ordinary business transaction. Schulte, Roth, therefore, accepted the payment in good faith.

### Without Knowledge of the Voidability

The Code requires, however, that even if the immediate or mediate transferee took for value in good faith, the transferee cannot have had knowledge that a statute would make the underlying initial transfer avoidable. *CCEC*, 175 B.R. at 638. Knowledge means that Schulte, Roth knew facts that would lead a reasonable person to believe that the property transferred was recoverable. When in possession of facts which suggest the existence of others, a transferee may not close its eyes to the remaining facts and deny knowledge. *Id.*

In November or December 1988, Parks retained Schulte, Roth to consider a hostile takeover of Southmark. When Parks concluded he could not finance a takeover, Schulte, Roth developed a different strategy for Parks to obtain control over Southmark. With Schulte, Roth's legal advice, the Parks Group pursued the proxy contest.

On March 1, 1989, the Parks Group disclosed to the SEC its intention to propose the Parks Group nominees for election to Southmark's board of directors. On April 20, 1989, the Parks Group publicly announced its intention to wage a proxy contest for control of Southmark. Between February and May 1989, Southmark and the Parks

Group commenced several suits against each other.

By May 1989 Schulte, Roth knew that Southmark issued a March 31, 1989, 10–Q report showing Southmark to be insolvent by $428,000,000. Media reports before May 1989, in the *Wall Street Journal* and the *Dallas Morning News,* reported the prospects of a Southmark bankruptcy filing. Southmark raised the specter of its inability to make bond interest payments in March 1989.

Schulte, Roth contemplated the effect of a bankruptcy petition on the Parks Group strategy. Jeffrey Sabin, a Schulte, Roth bankruptcy practitioner, analyzed the effect of a bankruptcy petition on a leveraged buyout of Southmark by the Parks Group. He also analyzed the possibility of a tactical bankruptcy petition to frustrate a proxy contest. He considered corporate governance issues in a Chapter 11 case. Sabin testified that Schulte, Roth always analyzed the bankruptcy risk to strategies for corporate control. Sabin is an experienced bankruptcy practitioner with a national reputation for his competency and knowledge. Sabin would not have closed his eyes to the possibility of the voidability of a transfer by Southmark to pay Schulte, Roth fees for corporate control by dissident shareholders.

But, by May 24, 1989, Southmark's situation apparently changed as far as Schulte, Roth could discern. With a settlement, the Parks Group would join the Southmark board of directors. Parks had no intention to file a bankruptcy petition for Southmark. After the settlement, Parks gave no thought to a tactical bankruptcy filing. As a stockholder, Parks intended to restructure Southmark's debt to enhance the value of its stock. A bankruptcy petition would have eliminated that possibility.

Members of Southmark's board of directors in the days prior to the settlement in May 1989 testified at depositions that Southmark's cash position had improved, alleviating the prospect of a bankruptcy petition. Arthur Weiss, the Southmark chief executive officer and chairman of the board, testified on May 24, 1989, the day before the settlement, that Southmark had $60,000,000 in cash. He testified that the board had been negotiating with the federal bank regulators to keep San Jacinto Savings Association open.

Schulte, Roth contends that with this information it had no reason to question that the bankruptcy prospect had eased. A settlement to provide the Parks Group with an opportunity to realize value for its stock thus seemed rational. Not having any non-bankruptcy law reason to conclude that Southmark actually owed the Parks Group for its legal fees before the settlement, Schulte, Roth argues that it had no reason to question the voidability of the $3,300,000 transfer.

These facts present a close question. On the one hand, in the early spring of 1989, Schulte, Roth knew Southmark faced an imminent threat of a bankruptcy petition. Schulte, Roth performed its legal work for the Parks Group with the impact of a bankruptcy petition in mind. The court infers that Schulte, Roth would recognize that a significant cash transfer pre-petition would be scrutinized by a bankruptcy fiduciary.

Yet, on the other hand, on the eve of the settlement, the Southmark board members testified that Southmark had stepped back from the precipice of an imminent bankruptcy petition. With $60,000,000 in cash and negotiations with the federal bank regulators proceeding, the Parks Group and Weiss believed that bankruptcy would be avoided.

■ Nevertheless, Southmark remained insolvent according to its 10–Q report. Schulte, Roth knew the contents of that report. Even if the Parks Group could not compel the payment of $3,300,000 before the settlement, Schulte, Roth possessed facts that would have caused it to believe that the Parks Group had not provided $3,300,000 of value to Southmark in exchange for the transfer. Section 550(b) requires that Schulte, Roth not have knowledge of the voidability of the transfer. The statute does not limit the inquiry to the avoidance action under Chapter 5 of the Bankruptcy Code later pursued by the bankruptcy fiduciary. Rather, it assesses Schulte, Roth's knowledge at the time of the transfer of the

$3,300,000 of the voidability of the transfer under any bankruptcy theory of recovery.

Schulte, Roth had facts which would have lead it to believe that San Jacinto Savings Association faced significant regulatory hurdles to remain open. Schulte, Roth knew Southmark had $1,000,000,000 in bond debt. Schulte, Roth knew that a bankruptcy fiduciary would scrutinize a $3,300,000 transfer to stockholders. Against these facts, an oral request for payment of $1,000,000 of fees, albeit in good faith as a business term, indicates that Schulte, Roth was concerned with the timing of the payment. Schulte, Roth knew that Chapter 5 avoidable transfers are pre-petition time sensitive. The court concludes that Schulte, Roth knew facts that would lead a reasonable person to believe that the $3,300,000 transfer to the Parks Group was recoverable.

The court, therefore, concludes, that if Southmark had established that Schulte, Roth was a transferee under § 550(a)(2), Schulte, Roth cannot claim the defense of § 550(b).

### 11 U.S.C. § 502(h)

Schulte, Roth contends that if Southmark obtains a judgment against it, Schulte, Roth may assert a claim against Southmark. 11 U.S.C. § 502(h). Southmark argues that even if Schulte, Roth pays the judgment, Schulte, Roth has no claim against Southmark,

As the law of this case, the Parks Group had a claim against Southmark. The claim was satisfied by the transfer pursuant to the settlement of May 24, 1989. The settlement agreement provided that Southmark would reimburse the Parks Group for its costs and expenses, including legal fees, incurred in conducting the proxy contest and related litigation. Southmark negotiated the settlement agreement with the knowledge that Schulte, Roth provided the legal services to the Parks Group.

▆▆▆ Assuming a § 550 money judgment paid by Schulte, Roth, Schulte, Roth may assert a claim against Southmark as an intended beneficiary of the Southmark/Parks Group settlement agreement. *Cauff, Lippman & Co. v. Apogee Finance Group, Inc.,*

807 F.Supp. 1007, 1019 (S.D.N.Y.1992). Schulte, Roth could also assert a claim against Southmark for unpaid legal fees pursuant to the doctrine of subrogation. According to the Fifth Circuit, Southmark actually owed the Parks Group for its legal fees before the settlement. The settlement recognized that Southmark would indeed pay them. The Parks Group received the preference. Ordinarily, R & P as initial transferee would return the preference without paying Schulte, Roth from the preference. Here, however, Schulte, Roth would be returning $1,000,000 of the preference leaving its legal fees unpaid. The Parks Group would have a claim against Southmark for the $1,000,000 based on the settlement agreement. Since the Parks Group would ordinarily pay its legal fees to Schulte, Roth, under these circumstances, Schulte, Roth could invoke the subrogation doctrine. *Gibbs v. Hawaiian Eugenia Corp.,* 966 F.2d 101, 105–106 (2d Cir.1992).

▆▆▆ Furthermore, it is axiomatic that when a defendant pays a money judgment under 11 U.S.C. §§ 547 and 550, the defendant obtains a claim in the bankruptcy case. One of the purposes of the recovery is to facilitate the equitable distribution of a bankruptcy estate to all entities who have allowable rights to payments. *See In re Criswell,* 102 F.3d 1411 (5th Cir.1997). To require repayment of a preference under §§ 547 and 550 without the ability to receive a dividend appears to frustrate the statutory purpose. A money judgment for an avoided preference does not implicate the intent or motive of the parties. Rather, it implicates a Congressionally mandated redistribution of otherwise properly distributed property. The defendant who satisfies the money judgment should, in the statutory scheme, share in the redistribution. But should a defendant who satisfies a money judgment under § 550 not hold, as a result, an allowable claim, the statute itself affords a remedy to honor the statutory scheme. Section 550(a) provides that to the extent a transfer is avoided under § 547, "the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property." Congress has thereby provided

the court with discretion in the awarding of a money judgment to address the circumstances of an adversary proceeding. If Southmark prevails at trial on the claim issue, the "rare if not unique fact situation," of 88 F.3d at 318, of this case may compel the court, in the exercise of its discretion, to consider the amount of recovery by creditors on their claims in the Southmark bankruptcy case, in determining the amount of a money judgment.

Schulte, Roth contends that if Southmark cannot provide the treatment for a claim precisely as provided under Southmark's confirmed plan of reorganization, then Southmark cannot obtain a judgment against Schulte, Roth. Charles Brewer, Southmark's current chief executive officer and its general counsel since July 1989, testified that the Schulte, Roth claim would have been classified under Class 8 of the plan. Southmark has distributed to class 8 claimants the cash dividend required by the plan. Southmark has also issued to Class 8 claimants and redeemed the notes required by the plan. Southmark has also issued to Class 8 claimants the preferred stock required by the plan and paid dividends on that stock. Southmark has not reserved notes or preferred stock for a Schulte, Roth Class 8 claim.

Schulte, Roth argues therefore that Southmark cannot provide Schulte, Roth with the treatment of its claim required by the plan. However, Southmark can provide the dollar value of the Schulte, Roth claim treatment under the plan. And the court, in the exercise of its discretion, as discussed above, may factor that dollar value of the Schulte, Roth claim treatment under the Southmark plan into the money judgment under § 550.

Accordingly, if an appellate court determines that Southmark should obtain a $1,000,000 judgment against Schulte, Roth, the judgment shall be offset by the dollar value of the Southmark plan dividend on a Schulte, Roth $1,000,000 Class 8 claim. Under the plan, Schulte, Roth would have received $32,441.14 in a cash dividend, 12% notes in the amount of $32,441 and 1,522, 625 shares of preferred stock. Schulte, Roth would have also received 11,081 shares of common stock. Southmark has redeemed

the 12% notes issued to Class 8 claimants. Southmark has also paid a total of $34.50 as dividends and interest on the dividends on shares of its preferred stock. The preferred stock dividend equals $52,530.56. The dollar value of the Southmark plan dividend on a Schulte, Roth $1,000,000 Class 8 claim is $117,412.70.

In the order entered March 24, 1997, the court determined that Southmark, if it prevailed at trial, would be entitled to pre-judgment interest from September 11, 1996. Applying that reasoning, Schulte, Roth should be credited with the plan dividend as of that date. That is, Southmark should have realized the value of its recovery on that date and Schulte, Roth, the value of its claim. The balance of $882,587.30 would be the Southmark judgment.

If an appellate court determines that Southmark should obtain a $843,000 judgment against Schulte, Roth, then the offset shall be adjusted proportionally and applied, with the balance being the amount of the judgment.

### Conclusion

The Fifth Circuit recognized the "rare if not unique fact situation" in this adversary proceeding. 88 F.3d at 318. The court appreciates that a transfer of the magnitude involved in this case must be carefully scrutinized as a preference. Indeed, the parties recognized this obligation and attempted to resolve the litigation by settlement. But §§ 547 and 550 remain technical statutes. Southmark failed to meet its burden of proof that Schulte, Roth was an immediate or mediate transferee of $1,000,000 of the $3,300,-000 Southmark transferred to the Parks Group. Consequently, even though Southmark has established that the transfer to the Parks Group was a preference against which Schulte, Roth could not establish an exception to an avoidance judgment under § 547, Southmark may not obtain a money judgment against Schulte, Roth under § 550. But, if it could, Schulte, Roth has not established the defense of § 550(b). On the other hand, Schulte, Roth would be entitled to a reduction in the judgment based on the dollar value of the Southmark plan dividend on the claim it would assert against Southmark.

Counsel for Schulte, Roth shall prepare a final order dismissing the complaint.